# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: August 11, 2015

**NO. 33,630**

**KATHERINE MORRIS, M.D., AROOP MANGALIK, M.D., and AJA RIGGS,**

Plaintiffs-Appellees,

v.

**KARI BRANDENBURG, in her official capacity as District Attorney for Bernalillo County, New Mexico, and GARY KING, in his official capacity as Attorney General of the State of New Mexico,**

Defendants-Appellants.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Nan G. Nash, District Judge**

Kennedy Kennedy & Ives, LLC
Laura Schauer Ives
Albuquerque, NM

ACLU of New Mexico Foundation
Alexandra Freedman Smith
Albuquerque, NM

Kathryn L. Tucker
Ojai, CA

for Appellees

Hector H. Balderas, Attorney General
Scott Fuqua, Assistant Attorney General
Santa Fe, NM

for Appellants

Rothstein, Donatelli, Hughes
Dahlstrom, Schoenburg & Bienvenu, LLP
Kristina Martinez
Carolyn M. "Cammie" Nichols
Santa Fe, NM

for Amicus Curiae The ALS Association New Mexico Chapter

Montgomery & Andrews, P.A.
Lara Katz
Santa Fe, NM

for Amicus Curiae Disability Rights Amici: Not Dead Yet, Adapt, American
Association of People With Disabilities, Autistic Self Advocacy Network,
Disability Rights Education and Defense Fund, National Council on Independent
Living, and the United Spinal Association

Garcia Ives Nowara, LLC
Molly Schmidt Nowara
Albuquerque, NM

Covington & Burling, LLP
Christina G. Kuhn
Washington, DC

for Amicus Curiae American Medical Women's Association, American Medical Student Association, and New Mexico Public Health Association

Robert Schwartz
Albuquerque, NM

for Amicus Curiae New Mexico Psychological Association

Alliance Defending Freedom
Catherine Glenn Foster
Washington, DC

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Emil J. Kiehne
Albuquerque, NM

for Amicus Curiae State of New Mexico Senators William F. Burt, Mark Moores, Steven P. Neville, William E. Sharer, and Pat Woods; State of New Mexico Representatives Paul C. Bandy, Sharon Clahchischilliage, David M. Gallegos, Jason C. Harper, Yvette Herrell, and James R.J. Strickler; and Christian Medical and Dental Associations

Stelzner, Winter, Warburton, Flores, Sanchez & Dawes, P.A.
Juan L. Flores
Jaime L. Dawes
Albuquerque, NM

for Amicus Curiae Michael J. Sheehan of the Archdiocese of Santa Fe, Bishop Oscar Cantú of the Diocese of Las Cruces, and Bishop James A. Wall of the Diocese of Gallup

**OPINION**

**GARCIA, Judge.**

{1}     A New Mexico statute makes "assisting suicide" a fourth degree felony and defines the proscribed conduct as "deliberately aiding another in the taking of his own life." NMSA 1978, § 30-2-4 (1963). The question presented is whether this statute may constitutionally be applied to criminalize a willing physician's act of providing a lethal dose of a prescribed medication at the request of a mentally competent, terminally ill patient who wishes a peaceful end of life (aid in dying) as an alternative to one potentially marked by suffering, pain, and/or the loss of autonomy and dignity. The district court concluded that Section 30-2-4 is invalid under two provisions of the New Mexico Constitution as applied to any physician who provides aid in dying to a patient. In reaching its conclusion, the district court determined that aid in dying is a fundamental liberty interest and that the State did not meet its burden to prove that Section 30-2-4 met a strict scrutiny standard of review. We conclude that aid in dying is not a fundamental liberty interest under the New Mexico Constitution. Accordingly, we reverse the district court's order permanently enjoining the State from enforcing Section 30-2-4. In addition, we affirm the district court's determination that, for statutory construction purposes, Section 30-2-4 prohibits aid

in dying. Finally, I would also remand to the district court for further proceedings regarding the remaining aid in dying claims raised by Plaintiffs, including the entry of findings and conclusions concerning whether Section 30-2-4 meets the intermediate standard of review required for important individual liberty interests under the New Mexico Constitution and/or whether it passes a rational basis standard of review as applied to aid in dying.

**BACKGROUND**

{2}    Plaintiffs are Dr. Katherine Morris, a surgical oncologist at the University of New Mexico (UNM); Dr. Aroop Mangalik, a UNM physician; and Aja Riggs, a patient who has been diagnosed with uterine cancer.[1] In the course of their practices, Drs. Morris and Mangalik provide medical care to mentally competent, terminally ill adults who have expressed interest in what Plaintiffs call "aid in dying," which the parties define as the "practice of a physician providing a mentally competent[,] terminally ill patient with a prescription for [a lethal dose of] medication which the patient may choose to ingest to achieve a peaceful death and thereby avoid further suffering."

---

[1]Although two Plaintiffs are doctors, the right at issue is asserted to belong to their patients, and doctors are typically deemed to have standing to assert the constitutional rights of their patients. *See Singleton v. Wulff*, 428 U.S. 106, 108, 117 (1976); *Doe v. Bolton*, 410 U.S. 179, 188 (1973).

3

{3}     Aid in dying has been legal in Oregon for nearly two decades. Or. Rev. Stat. Ann. §§ 127.800 to .897 (1997, as amended through 2013). Dr. Morris, who previously practiced in Oregon, administered aid in dying at the request of two patients in that state. The practice is also legal in Vermont, *see* Vt. Stat. Ann. tit. 18, §§ 5281 to 5292 (2013), and Washington, *see* Wash. Rev. Code Ann. §§ 70.245.10 to 70.245.904 (2009), and has been judicially recognized as a valid statutory defense to homicide in Montana, *see Baxter v. Montana*, 2009 MT 449, ¶ 1, 354 Mont. 234, 224 P.3d 1211. The practice is statutorily stated to be illegal in five other states, *see* Ark. Code Ann. § 5-10-106 (2007) (expressly prohibiting "physician-assisted suicide"); Ga. Code Ann. § 16-5-5(b), (d) (2012) (indicating application to physicians by requiring healthcare providers to notify the licensing board upon conviction); Idaho Code Ann. § 18-4017 (2011) (same); N.D. Cent. Code Ann. § 12.1-16-04 (1991) (prohibiting the issuance of prescriptions for the purpose of assisting suicide); R.I. Gen. Laws § 11-60-3 (1996) (prohibiting licensed healthcare practitioners from providing another the physical means to commit suicide), and is potentially prohibited in the majority of remaining jurisdictions by blanket manslaughter statutes similar to Section 30-2-4. *See, e.g.*, Cal. Penal Code § 401 (1905).

{4}	Uncertain about the legality of aid in dying in New Mexico, Drs. Morris and Mangalik filed suit seeking a declaration that they cannot be prosecuted under Section 30-2-4. They alleged that the statute does not apply to aid in dying, and if it does, such application offends provisions of our state constitution, including Article II, Section 4's guarantee of inherent rights and Article II, Section 18's Due Process Clause. The district court held a trial on the merits at which several witnesses testified for Plaintiffs. That testimony was uncontroverted and formed the basis for the district court's findings. The testimony and findings, which remain undisputed, establish the following facts.

{5}	Quality of life for terminally ill patients varies depending on the specific illness, its manifestations in the patient, and the patient's physical and psychological reserves. But progressive terminal illness, by definition, interferes with vital functions, such as eating and drinking, breathing, blood flow, and the basic functions of the brain. At any given moment, there are terminally ill patients in New Mexico "who find the suffering from their illness to be unbearable, despite efforts to relieve pain and other distressing symptoms." Some of those patients find the current options in end-of-life care to be inadequate to relieve their suffering and want the option of aid in dying. The dying process is often extremely difficult for patients with terminal

5

illnesses. As a surgical oncologist, Dr. Morris has treated cancer patients with a variety of end-of-life symptoms, such as irremovable "obstruction[s]" that cause the inability to swallow, fluid accumulation that leads to rapid and repeated distention of the abdomen, and swelling of the skin such that it splits open. In some instances, a patient's suffering is such that doctors induce unconsciousness—the so-called "barbiturate coma"—and then withhold hydration and nutrition until death arrives. As one example, Dr. Morris recalled treating a "really strong" firefighter who was approximately six foot, five inches tall and weighed 280 pounds. His skin cancer led to metastasis of the spine, which left him "sobbing in pain." All doctors could do to ease his pain "was make him unconscious" by administering "huge doses" of narcotics, muscle relaxants, and sedatives.

{6} Dr. Morris testified that sedating people to this level "suppresses their breathing and sometimes ends their li[ves]." The removal of life-sustaining nutrition and hydration also hastens the death of the sedated patient. Experts at trial described the "double-effect" of this practice of terminal (or palliative) sedation, as it is called: Although the physician's "primary intent"—or more accurately, motive—is to eliminate pain, the physician "inevitably know[s]" that administering such high doses of consciousness-lowering medications—at times, tens or even hundreds of times the

normal dosage—will lead, in close proximity, to the patient's death. Palliative sedation is an accepted medical practice and is allowed in New Mexico. *See generally* NMSA 1978, §§ 24-2D-1 to -6 (1999, as amended through 2012). The same is true for withdrawal of life-sustaining treatment measures. *See generally* NMSA 1978, §§ 24-7A-1 to -18 (1995, as amended through 2009). But these legal options for ending life arise only after the patient potentially endures a period of degeneration.

{7} Apart from pain, there are other reasons why a terminally ill patient may choose aid in dying. In Oregon and Washington, where data on aid in dying are required to be kept by statute, *see* Or. Rev. Stat. Ann. § 127.865; Wash. Rev. Code Ann. § 70.245.150, the most commonly cited end-of-life concern among patients who choose to ingest the lethal dose of medication is "loss of autonomy."[2] Patients in both states also frequently report that their illnesses cause a loss of dignity and a loss of the ability to engage in the activities that make life enjoyable. Oregon's Death With Dignity Act Rep., *supra*, at 5; Wash. Death With Dignity Act Rep., *supra*, at 7. Dr. David Pollack, a psychiatrist practicing in Oregon for over forty years, testified at

[2]Or. Pub. Health Div., Oregon's Death with Dignity Act Rep. (2014) *available at* https://public.health.oregon.gov/ProviderPartnerResources/EvaluationResearch/DeathwithDignityAct/Documents/Year17.pdf; Wash. State Dep't of Health, 2013 Death With Dignity Act Rep. Exec. Summary (2014) *available at* http://www.doh.wa.gov/portals/1/Documents/Pubs/422-109-DeathWithDignityAct2013.pdf

trial that patients choose to ingest the lethal dose of medication "to alleviate symptoms, to spare others from the burden of watching them dwindle away or be a shell of their former sel[ves] or to feel like they are in control, [to] have some autonomy and some control over the way that they die."

{8}     Plaintiff Aja Riggs, who has been diagnosed with life-threatening uterine cancer, testified that she did not know if she "want[ed] to go all the way to the end" and naturally die if the consequences of her cancer reached the terminal stages:

> I think one of the images that I had that I didn't and I don't want to have happen is that I'm lying in bed in pain, or struggling not to be in pain, or mostly unconscious with everybody that cares about me around me and all of us just waiting for me to die.

Ms. Riggs further testified that the legal availability of aid in dying would bring her peace of mind and help her feel that she can make controlled personal choices about her experience with cancer. This sentiment was echoed by Dr. Nicholas Gideonse who specializes in end-of-life care in Oregon:

> I've had patients who've had breast cancer for [twenty years], been through rounds of fighting and succeeding and remission and then not. They know these illnesses well. And . . . if they get the chance to write that final chapter, to at least describe how the story will end on their own terms, it's a great relief to patients and their families.

{9}     The trial testimony identified the existence and substance of a standard of care for determining terminality and eligibility for aid in dying in other states, derived

from the experience with the practice in Oregon, where it has been legal since 1997. In addition, it described a standard of care for determining mental competence, that physicians are trained to apply. The testimony further showed similarities among aid in dying, terminal sedation, and the removal or refusal of life-sustaining treatment, as well as the differences between aid in dying and suicide, including the distinct reasons for these acts.

{10}     The experience in Oregon has been that a number of patients who have been prescribed aid-in-dying medication never ingest it. According to the trial testimony, the availability of the medication nonetheless provides patients the comfort of knowing that there is a peaceful alternative to being forced to endure unbearable suffering. Still more patients do not request the medication after discussing the option with their physicians.

**The District Court's Judgment**

{11}     After trial, the district court found that physicians have provided and continue to provide aid in dying to qualified patients in Oregon, Washington, and Vermont (pursuant to statutory authorization); Montana (pursuant to an opinion of the Montana Supreme Court); and Hawaii (where there is no criminal prohibition). The court also found that, when aid in dying is available, "end[-]of[-]life care for all terminally ill

patients improves through better pain treatment, earlier and increased referrals to hospice[,] and better dialogues between physicians and their terminally ill patients about end[-]of[-]life care and wishes."

{12} Ultimately, the district court concluded that Section 30-2-4 prohibits aid in dying but that its application to aid in dying violates the inherent-rights guarantee and substantive due process protections afforded by Article II, Section 4 and Article II, Section 18 of the New Mexico Constitution. Citing *Washington v. Glucksberg*, 521 U.S. 702, 725 (1997), the district court acknowledged that the United States Supreme Court "declined to find the right to aid in dying to be . . . protected by the federal Constitution." The court nevertheless departed from federal precedent established in *Glucksberg*, noting that New Mexico has inherent power as a separate sovereign in our federalist system to provide more liberty under the New Mexico Constitution than that afforded by the federal Constitution. It then applied the interstitial approach to constitutional analysis mandated by our Supreme Court in such circumstances. *See State v. Gomez*, 1997-NMSC-006, ¶ 19, 122 N.M. 777, 932 P.2d 1. The district court concluded that the inherent rights clause of Article II, Section 4 provides "distinct additions" to the fundamental rights afforded under the federal Constitution and a basis to diverge from federal precedent.

{13} The district court specifically held that "[a] terminally ill, mentally competent patient has a fundamental right to choose aid in dying pursuant to the New Mexico Constitution's [Article II, Section 4] guarantee to protect life, liberty, and seeking and obtaining happiness . . . and its substantive due process protections [under Article II, Section 18]." Applying strict scrutiny, the court held that the State had failed to prove that by criminalizing the actions of physicians who provide aid in dying Section 30-2-4 furthers a compelling interest. The district court also ordered that the State be permanently enjoined from prosecuting any physician who provides aid in dying to mentally competent, terminally ill patients who choose to utilize aid in dying. The State timely appealed.

**ISSUES AND ARGUMENTS ON APPEAL**

{14} On appeal, the parties have stipulated to the factual record developed in the district court. The State argues that (1) there is no fundamental right to the deliberate assistance of a third-party in ending one's own life through aid in dying, and (2) the district court's ruling violates the doctrine of separation of powers by legalizing conduct that is designated to be a crime by the Legislature. In addition to disputing the State's contentions, Plaintiffs argue that Section 30-2-4 does not prohibit aid in dying.

## DISCUSSION

### I.    Statutory Construction: Section 30-2-4

{15}    We begin with the text of the statute, which provides, "[A]ssisting suicide consists of deliberately aiding another in the taking of his own life. Whoever commits assisting suicide is guilty of a fourth degree felony." Section 30-2-4. "Our principal goal in interpreting statutes is to give effect to the Legislature's intent." *Griego v. Oliver*, 2014-NMSC-003, ¶ 20, 316 P.3d 865. To do so, we first look to the language used and the plain meaning of that language. *State v. Moya*, 2007-NMSC-027, ¶ 6, 141 N.M. 817, 161 P.3d 862. "We refrain from further interpretation where the language is clear and unambiguous." *State v. Martinez*, 2006-NMCA-068, ¶ 5, 139 N.M. 741, 137 P.3d 1195 (internal quotation marks and citation omitted).

{16}    Plaintiffs contend that the statute does not prohibit aid in dying. Citing Rule 12-201(C) NMRA,[3] the State protests that this argument is not properly before us because the district court ruled against Plaintiffs on this point and Plaintiffs did not

---

[3]Rule 12-201(C) reads:

> An appellee may, without taking a cross-appeal or filing a docketing statement or statement of the issues, raise issues on appeal for the purpose of enabling the appellate court to affirm, or raise issues for determination only if the appellate court should reverse, in whole or in part, the judgment or order appealed from.

12

file a cross appeal. It argues that the doctrine that permits affirmance for any reason supported by the record, *see Meiboom v. Watson*, 2000-NMSC-004, ¶ 20, 128 N.M. 536, 994 P.2d 1154, cannot be applied because acceptance of Plaintiffs' statutory argument would require reversing, not affirming, the district court's conclusion that Section 30-2-4 prohibits physicians from providing aid in dying. We have held that "an appellee need not cross-appeal to raise an issue that would preserve the judgment below." *Cochrell v. Mitchell*, 2003-NMCA-094, ¶ 12, 134 N.M. 180, 75 P.3d 396 (alteration, internal quotation marks, and citation omitted). In any event, we cannot address the question presented—whether Section 30-2-4 may constitutionally be applied in the circumstances presented here—without first determining what the statute proscribes. We also must interpret statutes in a manner that avoids, to the extent possible, raising constitutional concerns. *Griego*, 2014-NMSC-003, ¶ 19. Accordingly, we determine the meaning of Section 30-2-4.

{17} The central point of Plaintiffs' statutory argument is that the Legislature's use of the term "suicide" in Section 30-2-4 suggests that the statute "clearly contemplates individuals who are not already dying, and nothing suggests it reaches a competent, dying patient's decision to achieve a peaceful death." The factual basis for this argument is the uncontested expert testimony of Dr. Pollack, which establishes that

13

"suicide is a distinctly different act than requesting aid in dying[.]" According to Dr. Pollack, suicide is a "despairing, lonely experience." He stated that it is an impulsive act—typically in reaction to psychological isolation, shame, guilt, or misunderstanding by others, and its effect on survivors is devastating. Family members tend to experience shock and disbelief or anger. In contrast, Dr. Pollack noted that those who request aid in dying do so to alleviate symptoms and to maintain relationships, connections, and a sense of self, and recognize that the problem confronting them arises from an irreversible physical calamity. They are already dying, and "[they are] focused on maintaining the quality of life that is something that they cherish." Dr. Pollack also testified that since the 1990s, increasing numbers of mental health and medical professionals have recognized that the two acts are fundamentally different, and treating physicians reject the idea that patients who have chosen aid in dying were committing suicide. He explained that if these patients could have survived their illnesses, they would have chosen to do so. The State concedes that distinctions between suicide and aid in dying identified in the fields of medicine and psychology are "compelling" but contends that they are "irrelevant from a legal standpoint."

14

{18}    As a textual matter, the State is correct. In defining the proscribed conduct—"[a]ssisting suicide"—as "deliberately aiding another in the taking of his own life[,]" the statute necessarily also defines "suicide" as "the taking of [one's] own life." Section 30-2-4. This statutory definition of "suicide" binds us. *See Cadena v. Bernalillo Cnty. Bd. of Cnty. Comm'rs*, 2006-NMCA-036, ¶ 15, 139 N.M. 300, 131 P.3d 687 ("As a rule[,] a statutory definition which declares what a term means is binding on the court." (alteration, internal quotation marks, and citation omitted)). As noted, the parties define "aid in dying" as "the practice of a physician providing a mentally competent[,] terminally ill patient with a prescription for [a lethal dose of an authorized] medication which the patient may choose to ingest to achieve a peaceful death[.]" While not recognized as "suicide" in a growing body of medical and psychological literature, a patient's choice to "achieve a peaceful death" is still "the taking of [one's] own life" under the statute's plain terms. *See* § 30-2-4. "[A]iding," in the context of "determining whether one is criminally liable for [his or her] involvement in the suicide of another," means "providing the means to commit suicide[.]" *State v. Sexson*, 1994-NMCA-004, ¶ 15, 117 N.M. 113, 869 P.2d 301. Dr. Morris testified at trial that a prescription for aid in dying is typically for the barbiturate Seconal, written for a uniform dose calculated to have lethal effect. This

15

conduct, by design, provides a patient the means to take his or her own life and is prohibited by the text of Section 30-2-4.

{19}     Citing the Uniform Health-Care Decisions Act, §§ 24-7A-1 to -18, as evidence of "New Mexico's long, proud tradition of public policy promoting autonomy in end-of-life decision making," Plaintiffs assert that we may consider the "clear policy implications of various constructions" if a statute is ambiguous. They also cite the Supreme Court of Montana's decision in *Baxter*, 2009 MT 449, ¶¶ 26-28, for the proposition that a state's public policy valuing autonomy in medical decision making can guide courts in determining whether assisted suicide includes aid in dying. But "[s]tatutory language that is clear and unambiguous must be given effect." *V.P. Clarence Co. v. Colgate*, 1993-NMSC-022, ¶ 8, 115 N.M. 471, 853 P.2d 722. And, where the language is plain, the court's task of statutory interpretation ends. *Martinez*, 2006-NMCA-068, ¶ 5.

{20}     Plaintiffs' arguments are unavailing in any event. Since enacting Section 30-2-4 in 1963, the Legislature has twice considered "assisted suicide" in the healthcare context. In both the Uniform Health-Care Decisions Act, §§ 24-7A-1 to -18, and the Mental Health Care Treatment Decisions Act, NMSA 1978, §§ 24-7B-1 to -16 (2006, as amended through 2009), the Legislature expressly refused to "authorize . . .

16

assited suicide . . . to the extent prohibited by other statutes of this state." Sections 24-7A-13(C); 24-7B-15(C). We note that the "other statute[ ] of this state" must be a reference to Section 30-2-4. Furthermore, *Baxter*'s exploration of statutes and precedents for evidence of state policy on medical decision making was expressly called for by the language of a statutory affirmative defense that invalidates the consent defense when "it is against public policy to permit the conduct or the resulting harm, even though consented to." 2009 MT 449, ¶¶ 11-13 (internal quotation marks and citation omitted). Plaintiffs' statutory argument fails, and we must address the district court's ruling that aid in dying is a fundamental liberty interest that is entitled to due process protection under the New Mexico Constitution.

**II.     The New Mexico Constitution**

{21}     Plaintiffs argue that Section 30-2-4's criminalization of aid in dying violates two provisions of the New Mexico Constitution: the Due Process Clause of Article II, Section 18, which has an analogous provision in the Fourteenth Amendment of the United States Constitution, and the inherent-rights guarantee of Article II, Section 4, which has no enumerated federal constitutional analogue. Although Plaintiffs do not assert a right to aid in dying under federal law, the State's argument is that there is no such right, and the inquiry continues to be identical to and controlled by the United

17

States Supreme Court's analysis in *Glucksberg*, 521 U.S. at 728, where it held that "the asserted 'right' to assistance in committing suicide is not a fundamental liberty interest protected by the [federal] Due Process Clause" and that "Washington's assisted-suicide ban [is] rationally related to legitimate government interests." Accordingly, we take cognizance of the necessity for an interstitial approach to constitutional analysis adopted by our Supreme Court in *Gomez*, 1997-NMSC-006, ¶ 19. Our review of the district court's interstitial approach is de novo. *See Bank of N.Y. v. Romero*, 2014-NMSC-007, ¶ 52, 320 P.3d 1 (stating that constitutional interpretation issues are reviewed de novo).

**A.      The Interstitial Approach to Interpreting the New Mexico Constitution**

{22}      *Gomez* made clear that "states have inherent power as separate sovereigns in our federalist system to provide *more* liberty than is mandated by the United States Constitution" and that "[w]e are not bound to give the same meaning to the New Mexico Constitution as the United States Supreme Court places upon the United States Constitution, even in construing provisions having wording that is identical, or substantially so, unless such interpretations purport to restrict the liberties guaranteed the entire citizenry under the federal charter." 1997-NMSC-006, ¶ 17 (internal quotation marks and citation omitted). While recognizing that "[f]ederal

18

precedent in areas addressed by similar provisions in our state constitutions can be meaningful and instructive[,]" *id.* ¶ 21 (internal quotation marks and citation omitted), our Supreme Court explained that it had abandoned a "lock-step" approach to interpretation of the New Mexico Constitution and applied an "interstitial [approach], providing broader protection where we have found the federal analysis unpersuasive either because we deemed it flawed . . . or because of undeveloped federal analogs[.]" *Id.* ¶ 20 (citations omitted).

> Under the interstitial approach, the court asks first whether the right being asserted is protected under the federal [C]onstitution. If it is, then the state constitutional claim is not reached. If it is not, then the state constitution is examined. A state court adopting this approach may diverge from federal precedent for three reasons: a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics.

*Id.* ¶ 19 (citation omitted); *see State v. Garcia*, 2009-NMSC-046, ¶ 34, 147 N.M. 134, 217 P.3d 1032 (rejecting widely criticized United States Supreme Court decision weakening a right "beyond a point which may be countenanced under our state constitution"); *State v. Rowell*, 2008-NMSC-041, ¶¶ 20-23, 144 N.M. 371, 188 P.3d 95 (declining to follow United States Supreme Court decisions criticized in legal literature as "devoid of a reasoned basis in constitutional doctrine"); *N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-005, ¶¶ 28-43, 126 N.M. 788, 975 P.2d 841

(concluding that distinctive characteristics of the New Mexico Constitution mandated rejection of federal constitutional analysis affording less protection); *State v. Gutierrez*, 1993-NMSC-062, ¶¶ 32, 50-56, 116 N.M. 431, 863 P.2d 1052 (discussing "a willingness to undertake independent analysis of our state constitutional guarantees when federal law begins to encroach on the sanctity of those guarantees" and rejecting a federal constitutional rule as incompatible with the guarantees of the New Mexico Constitution); *State v. Ochoa*, 2009-NMCA-002, ¶¶ 12-13, 146 N.M. 32, 206 P.3d 143 (rejecting a widely criticized United States Supreme Court decision, finding the federal analysis unpersuasive and incompatible with state constitutional standards).

{23}    Thus, our analysis of rights afforded by the New Mexico Constitution is not "inextricably tied" to federal constitutional analysis. *NARAL*, 1999-NMSC-005, ¶ 37; *see Gutierrez*, 1993-NMSC-062, ¶ 16 (stating that, in interpreting state constitutional guarantees, New Mexico courts may seek guidance from decisions of federal courts without being bound by those decisions). In seeking departure from federal due process precedent, Plaintiffs carried the initial burden to establish that greater due process protections should be recognized under Article II, Section 18 of our New

20

Mexico Constitution.[4] *See Gomez*, 1997-NMSC-006, ¶ 22-23; Rule 12-216(A) NMRA. The basis for interpreting greater protections under Article II, Section 18 of the New Mexico Constitution must first be addressed and found to exist by the district court. *Gomez*, 1997-NMSC-006, ¶ 23. In its findings of fact and conclusions of law, the district court identified the following reasons for greater protection under Article II, Section 18, which we summarize numerically:

1. Our Supreme Court has already recognized greater protections under the New Mexico Constitution in "many instances[,]" citing *Montoya v. Ulibarri*, 2007-NMSC-035, ¶ 22, 142 N.M. 89, 163 P.3d 476 (recognizing that the New Mexico Constitution provides greater rights than those provided in the federal constitution in the areas of double jeopardy, search and seizure, and equal protection).

2. Our Supreme Court has recognized that some rights of a "personal nature" are entitled to constitutional protection, such as "the right of parents in the care, custody, and control of their children"; "the freedom of personal choice in matters of family life"; and "the right to family integrity," citing *In re Pamela A.G.*, 2006-

[4]We note that interstitial review in this instance must be utilized to resolve Plaintiffs' claim that Article II, Section 18 provides New Mexicans with a due process right to aid in dying that was denied under the federal constitution. Regarding Article II, Section 4, no federal analogue exists and our analysis is initially interpretive and it potentially becomes interstitial only if substantive due process recognition is also required to establish Plaintiffs' proposed interest under Section 4.

21

NMSC-019, ¶ 11, 139 N.M. 459, 134 P.3d 746 (recognizing the interest of parents in the care, custody, and control of their children as a fundamental liberty interest); *Oldfield v. Benavidez*, 1994-NMSC-006, ¶ 14, 116 N.M. 785, 867 P.2d 1167 (recognizing the general right to familial integrity as a clearly established constitutional right but noting its parameters are not absolute, unqualified, or clearly established); and *Jaramillo v. Jaramillo*, 1991-NMSC-101, ¶¶ 15-21, 113 N.M. 57, 823 P.2d 299 (addressing the constitutional right to travel in the context of assigning the burden of proof between a relocating custodial parent and the non-custodial parent).

3. The protected liberty interest of a terminal patient dealing with imminent death that was identified in *Cruzan ex rel. Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 278-79 (1990), is more closely aligned with the liberty interest in this case and is entitled to protection under Article II, Section 18, despite not being protected under the Due Process Clause of the Fourteenth Amendment in *Glucksberg*.

{24}    We note that as part of their interstitial argument, Plaintiffs also asserted that New Mexico has made an enhanced commitment to patient autonomy at the end of life, and Article II, Section 18 should recognize greater protections through the equal

protection test articulated in *Breen v. Carlsbad Municipal Schools*, 2005-NMSC-028, ¶ 8, 138 N.M. 331, 120 P.3d 413. This equal protection assertion was not recognized by the district court and was not included in its findings.

{25}   Prior to any hearings held by the district court, the State moved to dismiss Plaintiffs' complaint based upon substantially the same governmental interests determined to exist by the United States Supreme Court in *Glucksberg*. *See* 521 U.S. at 703-04. While the State does not fully concede application of the interstitial approach suggested by Plaintiffs, the district court's findings nonetheless identified a basis for establishing greater protections in New Mexico by application of the interstitial approach. First, it held that the distinctive individual interests embodied under Article II, Section 4 are not enumerated as protections within the federal Constitution and these enumerated New Mexico interests have been recognized to support the existence of other inherent rights by our Supreme Court. *See Griego*, 2014-NMSC-003, ¶ 1 (relying upon Article II, Section 4 to identify the inherent rights "enjoyed by all New Mexicans" that must then be legally measured because "it is the responsibility of the courts to interpret and apply the protections of the Constitution"). Second, its findings concerning the experiences in other states where aid in dying is legal support the notion that the federal analysis in *Glucksberg* may

23

be flawed and thus may not constitute an authoritative bar to protection under Article II, Section 18 of the New Mexico Constitution. As a result, current due process analysis could result in a different factual and legal outcome than that of *Glucksberg*. Having identified Article II, Section 18 as the basis for application of the interstitial approach under the New Mexico Constitution, the district court rejected *Glucksberg*'s analysis and concluded that greater constitutional protections are provided under the New Mexico Constitution. We review the interstitial analysis employed by the district court as to both constitutional provisions to address whether aid in dying constitutes a liberty interest under either of these two sections of the New Mexico Constitution.

**B.      Aid in Dying as Defined and Applied by the Parties**

{26}      Plaintiffs contend that aid in dying is "fundamental or, at the very least, important under the New Mexico Constitution." On appeal, Plaintiffs identify the fundamental rights implicated in aid in dying as (1) the "right to autonomous medical decision making" and (2) the right to "a dignified, peaceful death." The district court agreed that aid in dying is a fundamental liberty interest protected by the New Mexico Constitution. Constitutional interpretation is an issue of law we review de novo. *State v. Boyse*, 2013-NMSC-024, ¶ 8, 303 P.3d 830. In doing so, we must consider the claimed constitutional interest in the context in which the allegedly protected conduct

takes place. Additionally, we emphasize at the outset that the interest asserted here applies only to a narrowly defined class of New Mexico citizens.

{27} Plaintiffs do not argue that there is a broad, categorical constitutional right to commit suicide that includes a right to third-party assistance in doing so. Rather, Plaintiffs precisely and narrowly define their claimed liberty interest as one that does not apply to any large classification of citizens. We understand Plaintiffs' assertion to be that this narrowly defined interest is only fundamental where: (1) a mentally competent patient is capable of giving consent, (2) the patient is diagnosed as terminally ill, (3) the patient requests a prescription for medication that may be ingested to bring about an immediate end to his/her life, and (4) a willing physician applying the proper standard of care determines that it would be appropriate to provide and prescribes the terminal dose of medication for the patient to ingest and end the patient's life.

{28} The State concedes that citizens have a right to make their own end-of-life decisions and to bring about their own deaths without the aid or assistance of another person. There is also no dispute that a physician may lawfully act pursuant to statute to support a patient's desire to shorten the dying process by removing life-sustaining nutrition, hydration, or mechanical life support, and by administering palliative

25

sedation (high doses of consciousness-lowering medications). *See generally* §§ 24-2D-1 to -6; 24-7A-1 to -18. At oral argument, the State even suggested that patients may bring about the end of their own lives by stockpiling morphine lawfully prescribed by a physician and ultimately ingesting a lethal dosage. According to the State, this act does not involve the statutorily defined aid or assistance of another person under Section 30-2-4, even though it involves a physician's act of prescribing the medication used by the patient to cause his/her own death. The State also "readily concede[d]" that, except for the acts of aiding or assisting a person in taking his or her own life, it had no interest in causing mentally competent, terminally ill patients to suffer during the final days of their lives.

**C.    Aid in Dying Is Not a Fundamental Liberty Interest Protected by the Due Process Clause of the New Mexico Constitution**

{29}    The Due Process Clause of the New Mexico Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law[.]" N.M. Const. art. II, § 18. The federal Due Process Clause similarly provides that no state "shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. Because the State's due process argument relies primarily on *Glucksberg*, the principal federal case interpreting the liberty interest described here as aid in dying, we shall address its application to our decision

26

even though it does not bind our interpretation under Article II, Section 18, or curtail the potential for broader protections under the New Mexico Constitution. *See Gomez*, 1997-NMSC-006, ¶ 19. We also address the narrow scope of Plaintiffs' proposed liberty interest and its relationship to the interests of life, liberty, and happiness that are enumerated protections within Article II, Section 4.

**1.      The Federal Analysis of Due Process and *Glucksberg***

{30}      In *Glucksberg*, the United States Supreme Court confirmed that the substantive component of the Due Process Clause under the Fourteenth Amendment protects certain aspects of personal autonomy as fundamental rights notwithstanding that they are not mentioned in the text of the Bill of Rights. *Glucksberg*, 521 U.S. at 720-21; *see Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 847 (1992) (explaining that the United States Supreme Court has never accepted the view that "liberty encompasses no more than those rights already guaranteed to the individual against [governmental] interference by the express provisions of the first eight [a]mendments to the Constitution"). The Court stated that the government may not interfere with certain liberty interests unless the government meets its burden under a strict scrutiny standard—proving that the infringing statute is narrowly tailored to serve a compelling governmental interest. *Glucksberg*, 521 U.S. at 721. In *Glucksberg*, four

27

physicians, three terminally ill patients, and one nonprofit organization filed suit against the State of Washington, seeking a declaration that the state's ban on assisting suicide was unconstitutional. 521 U.S. at 707-08. Under the Due Process Clause of the Fourteenth Amendment, the plaintiffs asserted a liberty interest to allow a mentally competent, terminally ill adult the right to choose physician-assisted suicide as a method to end life. *Id.* The United States Supreme Court unanimously determined that "the asserted 'right' " to physician-assisted suicide is not a liberty interest entitled to any type of protection under the Due Process Clause of the Fourteenth Amendment. *Id.* at 728, 735 (precluding its recognition as a constitutionally protected due process liberty interest because of society's nearly universal efforts to prevent suicide and assisted suicide and due to the importance of the state's interest in regulating both the real and potentially adverse consequences of assisted suicide).

{31} Fundamental constitutional rights are enumerated and "specific freedoms protected by the Bill of Rights," *id.* at 720, or those later identified by process of the United States Supreme Court's enforcement of equality and liberty guaranteed by the Fifth and Fourteenth Amendments. *See Lawrence v. Texas*, 539 U.S. 558, 575 (2003) ("Equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects[.]").

28

While constitutional interpretation must address "new dimensions of freedom" over time, *see Obergefell v. Hodges*, __ U.S. __, 135 S. Ct. 2584, 2596 (2015), the sum of such rights remains principally static because, in the words of the fourth Chief Justice of the United States Supreme Court, John Marshall, "we must never forget, that it is a *constitution* we are expounding." *M'Culloch v. Maryland*, 17 U.S. 316, 407 (1819). Constitutions, including our New Mexico Constitution, are sacred because they were written to apply in perpetuity. *See Republican Party of N.M. v. N.M. Taxation & Revenue Dep't*, 2012-NMSC-026, ¶ 52, 283 P.3d 853 ("The constitution is the heart, the soul, the genius of our system of government, and its safeguarding is [our New Mexico Supreme] Court's highest duty and most sacred function." (internal quotation marks and citation omitted)). "The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in [the] field [of substantive due process.]" *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992); *see also Log Cabin Republicans v. United States*, 658 F.3d 1162, 1170 (9th Cir. 2011) ("[W]hen confronted with assertions of new fundamental rights, rather than invite innovation the [c]ourt has counseled caution."). Plaintiffs' assertion of a new form of constitutional right, one that protects a terminally ill patient's interest in death and the

process of dying, is the type of new dimension that warrants such a careful exercise of judicial caution.

{32}    The constitutional question here—whether aid in dying is a constitutional right, fundamental or otherwise—has only been directly answered by one case, *Glucksberg*. Nearly twenty years have passed since *Glucksberg* concluded that a physician's "assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause" of the Fourteenth Amendment. 521 U.S. at 728. Despite its share of criticism over the years, *see* Dissenting Op. ¶¶ 98-99, no court, federal or state, has held that the concept of death, including a method of a more dignified premature death with the assistance of another person, is rooted within the protections of bodily integrity under the constitution.

{33}    *Glucksberg* both recognized and relied upon "over 700 years [of] Anglo-American common-law tradition [that] has punished or otherwise disapproved of both suicide and assisting suicide." 521 U.S. at 711. *Glucksberg*'s determination that there exists no precipitate constitutional alleyway to the permanent nationwide legality of physician-assisted suicide also stated its awareness of "serious, thoughtful examinations" regarding aid in dying in various states. *Id*. at 719. It concluded by permitting "earnest and profound debate about the morality, legality, and practicality

of [aid in dying] . . . to continue, as it should in a democratic society." *Id*. at 735; *see id*. at 737 (O'Connor, J. concurring) ("There is no reason to think the democratic process will not strike the proper balance between the interests of terminally ill, mentally competent individuals . . . and the [s]tate's interests in protecting those who might seek to end life mistakenly or under pressure."); *id*. at 789 (Souter, J., concurring) (cautioning against "displace[ment of] the legislative ordering of things"). Confirming that it meant what it held in *Glucksberg*, eight years later, the Supreme Court rejected executive action undertaken by the United States Department of Justice to apply the Controlled Substances Act to disallow physicians from prescribing fatal narcotics as authorized by Oregon's Death With Dignity Act.[5] *See Gonzales v. Oregon*, 546 U.S. 243 (2006). *Obergefell* also recently mentioned the *Glucksberg* decision that has allowed the states to undertake nearly twenty years of

---

[5]*See* Or. Rev. Stat. Ann. §§ 127.800 to .897. Despite the Supreme Court's invitation to utilize the democratic process to allow aid in dying in 1997, only three states have presently enacted such enabling legislation. Significantly, at least thirteen other states—Alaska, California, Colorado, Connecticut, Delaware, Maine, Maryland, Massachusetts, Missouri, Nevada, Utah, Wisconsin, and Wyoming—have rejected aid in dying by referendum or have failed to pass aid in dying legislation through each state's legislative process. *See* Patients Rights Council, *available at* http://www.patientsrightscouncil.org/site/assisted-suicide-the-continuing-debate/ (last visited July 10, 2015) (tracking ballot initiatives and legislation regarding aid in dying).

31

independent experimentation to properly balance the varying interests of the terminally ill. *Obergefell*, __ U.S. at __, 135 S. Ct. at 2596.

{34}  Before addressing Plaintiffs' due process claim under Article II, Section 18, we are compelled to address the methodologies applied when litigants pursue due process interests they believe to be implied by the words chosen by the founders of our nation and its states. Prior opinions have expressed the legally analytic, yet structurally ideologic, tug-of-war that exists within courthouses across the nation, including the United States Supreme Court itself. *Compare Glucksberg*, 521 U.S. at 720-21 (weighing the constitutional stature of an asserted right by direct review of "this Nation's history and tradition" (internal quotation marks and citation omitted)), *with Lawrence*, 539 U.S. at 572 ("History and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry." (alteration, internal quotation marks, and citation omitted)), *and Obergefell*, __ U.S. at __, 135 S. Ct. at 2598 ("History and tradition guide and discipline this inquiry but do not set its outer boundaries. That method respects our history and learns from it without allowing the past alone to rule the present."(citation omitted)). Yet in this instance, any philosophical attempt to resolve that bigger constitutional picture serves only to distract our focus from the real issues to be considered. The fact that *Glucksberg*'s

analytic methodology has been questioned by some legal scholars does not mean the opposite of its holding must be true. More critically for our purposes, *Glucksberg* provided a substantive due process answer to a factually identical scenario that has never been rejected by any state appellate court. The issue before us is not whether *Glucksberg* is one of several available constitutionally interpretive "guideposts for responsible decision[]making," *Collins*, 503 U.S. at 125; rather, it remains the only existing precedent regarding the nearly identical constitutional question that is posed in this case. In order to justify a departure from *Glucksberg*, Plaintiffs must have shown precisely why greater fundamental due process protections exist under Article II, Section 4.

{35}    *Obergefell* suggests that the assisted suicide analysis in *Glucksberg* remains unchanged. *See Obergefell*, __ U.S. at __, 135 S. Ct. at 2602. The *Obergefell* majority briefly addressed aid in dying and distinguished that asserted right of physician assisted suicide from the asserted interest in marriage that was before it. *Id.* In *Obergefell*, every member of the United States Supreme Court, including those justices that the Dissenting Opinion identifies to embrace a more evolving due process concept of constitutional analysis and the developed interests in autonomy of self, passed upon an opportunity to question the majority's reference to the

33

outcome in *Glucksberg* or cast aspersion upon the analysis of aid in dying that was utilized in *Glucksberg*. *Obergefell*, __ U.S. at __, 135 S. Ct. at 2602. *See* Dissenting Op. at ¶¶ 96 & 100. Specifically, while *Obergefell* recognized the re-ordering of evaluative constitutional criteria in similar due process cases, it provided a specific reference of approval and a brief defense of *Glucksberg* by stating that the "central reference to historical . . . practices . . . may have been appropriate for . . . (physician-assisted suicide), [yet not for] other fundamental rights, including marriage and intimacy." *Obergefell*, __ U.S. at __, 135 S. Ct. at 2602. Although the United States Supreme Court appears engaged in an effort to integrate its constitutional jurisprudence, including *Glucksberg*, *see Obergefell*, __ U.S. at __, 135 S. Ct. at 2602, it is our view that we should continue to be very careful when considering new constitutional interests and remain reluctant to deviate from United States Supreme Court determinations of what are, and what are not, fundamental constitutional rights.

{36} Irrespective of the new interpretive dimensions applied by the United States Supreme Court to address differing applications of due process, the substantive fundamental rights that are recognized to exist under the Due Process Clause of the Fourteenth Amendment have always originated from classic personal interactions or embedded principles in our democratic society. These protections include the

longstanding interests in marriage, *see Loving v. Virginia*, 388 U.S. 1 (1967); sexual relationships, *see Lawrence*, 539 U.S. 558; family integrity, *see Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942); child rearing, *see Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925); education of one's children, *see Meyers v. Nebraska*, 262 U.S. 390 (1923); and bodily integrity, *see Rochin v. California*, 342 U.S. 165 (1952). Plaintiffs have failed to provide any authority to support the position that "death" or "aid in dying" in New Mexico have either been recognized as embedded principles within our democratic society or as a modern interpretation of certain fundamental interests that have been applied to some members of society but historically denied to others. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 ("We assume where arguments in briefs are unsupported by cited authority, counsel after diligent search, was unable to find any supporting authority."); *see also* John B. Mitchell, *My Father, John Locke, &Assisted Suicide: The Real Constitutional Right*, 3 Ind. Health L. Rev. 45, 59 (2006) (evaluating the various attempts at articulating the fundamental right at issue in *Glucksberg* and illustrating the difficulty in identifying the right's contours, while further suggesting that "it would probably be fairer to the proponents of [physician-assisted suicide] in the Glucksberg [c]ourt to equate the phrase dying with dignity with a [substitute phrase,] rejection of bad

death"). For example, *Cruzan* has been offered by Plaintiffs to identify an equivalent liberty interest to aid in dying. 497 U.S. 261. But the constitutionally protected right assumed to exist in *Cruzan*, 497 U.S. at 279—the right to refuse medical treatment, including lifesaving hydration and nutrition—was clearly distinguished and specifically rejected as an equivalent interest to aid in dying. *Glucksberg*, 521 U.S. at 722-23, 730-31. In addition, the modern concerns associated with aid in dying—regarding issues of pain, suffering, dignity, and autonomy during the final days of a person's life—are medical circumstances that have only garnered growing consideration in modern society due to the longevity, pain management, and life-sustaining advancements that have been made more recently by the medical profession. *See Cruzan*, 497 U.S. at 270. As discussed in more detail below, we are also troubled that Plaintiffs and their witnesses have narrowed the focus of an autonomous and dignified death to one that favors only a very narrow segment of the population—only those New Mexicans who are competent, terminally ill, and under the care of a physician.

{37}     Aid in dying, the medical concept of dying with autonomy and dignity, is a relatively recent human phenomena and deserves appropriate public evaluation and consideration. However, as a new legal consideration, it must also be carefully

36

weighed against longstanding societal principles such as preventing a person from taking the life of another; preventing suicide; preventing assisted suicide; promoting the integrity, healing, and life preserving principles of the medical profession; protecting vulnerable groups from unwanted pressure to considering aid in dying as the best alternative to other medical options; and promoting human life where aid in dying is not the appropriate medical option despite a patient's request for its use. *See Glucksberg*, 521 U.S. at 703-04; *see also Cruzan*, 497 U.S. at 270-71. The recent advances in life-prolonging medical care and the public acceptance of aid in dying in some states has not diminished the other longstanding societal principles and concerns regarding intentional killing, the dying process, the preservation of life, and the basic life saving principles embedded in the medical profession. *Cruzan*, 497 U.S. at 280 ("As a general matter, the [s]tates—indeed, all civilized nations—demonstrate their commitment to life by treating homicide as a serious crime. Moreover, the majority of [s]tates in this country have laws imposing criminal penalties on one who assists another to commit suicide."). Plaintiffs' witnesses established that certain benefits have been clinically shown to exist and that several of society's concerns have not materialized when careful regulations and safeguards are imposed upon aid in dying by the medical profession and state legislatures. Yet, even where statutory

approval has been achieved, improper application of the statutory protections that allow aid in dying will still expose an offending physician or other responsible parties to criminal liability if they fail to comply with the statutes' narrow parameters. *See* Or. Rev. Stat. Ann. § 127.890; Vt. Stat. Ann. tit. 18, § 5283(b); Wash. Rev. Code Ann. § 70.254.200. As a result, aid in dying is still in the process of being tested by society and the various states where it has been sanctioned. Presently, aid in dying is best described as a legal and societal work in progress. To assert that it has now risen to the level of a fundamental due process right, requiring strict constitutional protection from society's longstanding interest in the protection of life through its final stages, has not been established by this record or by other jurisprudence.

{38}     Lastly, regarding the constitutional stature of aid in dying, the ultimate arbiter of the meaning of the New Mexico Constitution is our New Mexico Supreme Court. *See State v. ex rel. Serna v. Hodges*, 89 N.M. 351, 356, 552 P.2d 787, 792 (1976), overruled on other grounds by *State v. Rondeau*, 89 N.M. 408, 412, 553 P.2d 688, 692 (1976) (recognizing that "as the ultimate arbiters of the law of New Mexico[,] [our Supreme Court is] not bound to give the same meaning to the New Mexico Constitution as the United States Supreme Court places upon the United States Constitution"). We have previously recognized that under circumstances where it

38

appears "that an uncertain state of law should not exist and because avoidance of the same involves an issue of substantial public interest, the matters raised on appeal should be resolved by the Supreme Court." *Archibeque v. Homrich*, 1975-NMCA-023, ¶ 5, 87 N.M. 265, 531 P.2d 1238 (per curiam). Such a constitutional shift from the United States Supreme Court decision in *Glucksberg*, one that was recently referenced anew in *Obergefell*, should be addressed by our state's highest court. *See Archibeque*, 1975-NMCA-023, ¶ 5; *see also Quill v. Vacco*, 80 F.3d 716, 725 (2d Cir. 1996) ("We . . . decline the plaintiffs' invitation to identify a new fundamental right [to physician-assisted suicide], in the absence of a clear direction from the Court whose precedents we are bound to follow. The limited room for expansion of substantive due process rights and the reasons therefor have been clearly stated[.] . . . Our position in the judicial hierarchy constrains us to be even more reluctant than the [United States Supreme] Court to undertake an expansive approach in this unchartered area." (internal quotation marks and citation omitted)), *rev'd on other grounds*, *Vacco v. Quill*, 521 U.S. 793 (1997) (internal quotation marks and citation omitted)). Similar to our New Mexico Supreme Court, we are not heedless to changes occurring over time but are careful to expand constitutional interpretations of the law to satisfy our own concepts of right or wrong. *See State v. Pace*, 1969-NMSC-055,

39

¶ 23, 80 N.M. 364, 456 P.2d 197 ("We are not heedless of the plea that this is a more enlightened day than were those of years gone by, and that views of what is and what is not right have changed with the passage of time. However, we perceive our responsibility as being confined to interpreting the law as we understand it, not to making of new law to satisfy our conceptions of right or wrong."). From the perspective of constitutional interpretation, *Glucksberg*'s holding still provides this Court with principled authority. Given our analysis, and consistent with *Glucksberg*, we conclude that there is no fundamental right to aid in dying under Article II, Section 18 of the New Mexico Constitution. Therefore, interstitial departure to declare such a right would be inappropriate. *See Gomez*, 1997-NMSC-006, ¶ 19 (allowing interstitial identification of a right when existing federal precedent is flawed).

**2.      Inherent Rights Under Article II, Section 4**

{39}      Article II, Section 4 specifically identifies three broad categories of individual interests that are entitled to constitutional protection in New Mexico—life, liberty, and happiness. However, Article II, Section 4 has been sparsely interpreted. *See Reed v. State ex rel. Ortiz*, 1997-NMSC-055, ¶ 105, 124 N.M. 129, 947 P.2d 86 (recognizing that "[o]ur courts have not fully defined the scope of this constitutional

40

provision"), *rev'd sub nom. on other grounds by N.M. ex rel. Ortiz v. Reed*, 524 U.S. 151 (1998). The Oxford English Dictionary defines "life" as "[t]he condition or attribute of living or being alive; animate existence. Opposed to *death*." 8 *Oxford English Dictionary* 910 (2d ed. 1989, reprinted with corrections 1991). Plaintiffs ask us to interpret Article II, Section 4's express protections of liberty and happiness as encompassing an implied inherent right to oppose the protected principle of life by constitutionally allowing third-party physicians to intentionally hasten another person's death. We decline to recognize Article II, Section 4 as protecting a fundamental interest in hastening another person's death because such an interest is diametrically "[o]pposed" to the express interest in protecting life. 8 *Oxford English Dictionary*, *supra*, at 910.

{40}     At its core, aid in dying challenges the longstanding and historic interest in the protection of life until its natural end as well as the equally longstanding prohibition against assisting another in hastening that process. *See Glucksberg*, 521 U.S. at 710-16 (observing that our nation's historical approach has been to disallow assisting another person in the taking of his/ her own life regardless of the circumstances). This treasured right to life is not only considered sacred under the common law but is also recognized as an inalienable right, even for those condemned to death. *See id.* at 714-

15 (citing *Martin v. Commw.*, 37 S.E.2d 43, at 47 (Va.1946) ("'The right to life and to personal security is not only sacred in the estimation of the common law, but it is inalienable.'") and *Blackburn v. State*, 23 Ohio St. 146, 163 (1872) ("'[E]ven the lives of criminals condemned to death, [are] under the protection of the law[.]'"), *overruled in part on other grounds by State v. Staten*, 247 N.E.2d 293 (Ohio 1969)). Assisting a condemned criminal in taking his/her own life has also been subjected to punishment. *Commw. v. Bowen*, 13 Mass. 356 (1816). The inalienable right that defends life is also a prioritized constitutional interest in New Mexico. *See Reed*, 1997-NMSC-055, ¶ 103 ("When a person's life is jeopardized by the actions of the state without due process, *no constitutional interest is of greater consequence. . . . The transgression is not only against a single human being but also the most basic principles upon which our system of government was founded.*" (emphasis added) (citation omitted)); *Trujillo v. Prince*, 1938-NMSC-024, ¶ 15, 42 N.M. 337, 78 P.2d 145 (1938) ("The [c]onstitution and statute, allowing compensation for life lost through negligence of another, adopt a policy touching the most important subject of all government, in which it is recognized that human life should be protected as well from negligence as from crime. . . . It could scarcely be said that a man has any greater right in his own life now than he had before the adoption of the constitutional

42

provision and statutes of a kindred nature. His right originally was *above all others*, save where it is forfeited for crime." (emphasis added) (internal quotation marks and citation omitted)). Although the dissent concedes, in general terms, that the government has a compelling and substantial constitutional interest in preserving life, it then concludes that this expressly prioritized constitutional interest in life was not adequately articulated by the State to address the needs of New Mexicans dying from terminal illness and, as a result, effectively disappears upon a medical determination of terminal illness. *See* Dissent ¶¶ 112-114, 117, 121 & 127.

{41}     We understand Plaintiffs to assert that the process of dying during the final stages of life, defined as a terminally ill patient with six months or less to live, is now an accepted constitutional priority that falls within an intimate zone of privacy and that contemporary generations view aid in dying as a fundamental constitutional interest that deserves strict protection from governmental intrusion. However, death and the process of dying are not rights expressly enumerated within Article II, Section 4 and can only qualify as inferences that might exist within the categories of liberty or happiness. Plaintiffs cite no American case law that interprets the interests of constitutional liberty and happiness as extending protection to a third-party that assists another with intentionally taking his or her own life. *See In re Adoption of*

43

*Doe*, 1984-NMSC-024, ¶ 2 ("We assume where arguments in briefs are unsupported by cited authority, counsel after diligent search, was unable to find any supporting authority."). The leap from a general societal concern about pain, suffering, and/or loss of autonomy and dignity during the final months of a terminally ill person's life into the creation of an Article II, Section 4 fundamental constitutional right to protect physicians who practice aid in dying is unprecedented. *See Pace*, 1969-NMSC-055, ¶ 23 (recognizing the need for judicial restraint when society may have changed over time and adhering to the preference for deferring to the legislative process for legal changes to keep "our existing laws in step with current thinking"). The Dissenting Opinion's analysis of how this Court should achieve the creation of this new fundamental interest under the New Mexico Constitution is also vague. *See* Dissent ¶¶ 110-114.

{42}      The Dissenting Opinion appears to argue that a new constitutionally recognized event now occurs upon the diagnosis of terminal illness. *Id.* First, a patient's right to privacy automatically creates an inferred end-of-life liberty interest under Article II, Section 4 in the event of terminal illness. *Id.* Next, this new liberty interest ascends to constitutional priority over life itself. *Id.* Ultimately, the Dissenting Opinion harshly criticizes the majority for failing to agree with this new constitutional result.

44

*Id.* at ¶ 114. It then extends this criticism by asserting that the majority is cavalier about the needs of the terminally ill, to the point it asserts that the majority is shockingly disrespectful to both physicians and the terminally ill. *Id.* References of ignorance, disrespect, or miscreance leveled at one's colleagues by the Dissenting Opinion are improper and unnecessarily harmful to our judicial process. *See id.*

{43} We are not persuaded by Plaintiffs' position that a modern desire to hasten death under the rubric of medical privacy can be inferred to take priority over the express fundamental interest in life set forth in Article II, Section 4. Medical privacy has never been constitutionally extended to such a high constitutional level, especially when "[i]t cannot be disputed that the Due Process Clause protects an interest in life." *Cruzan*, 497 U.S. at 281. Any development of the importance that society may eventually attribute to dying with autonomy and dignity remains inferential and secondary to life under the enumerated language set forth in Article II, Section 4 as well as our New Mexico precedent. *See Reed*, 1997-NMSC-055, ¶ 103; *Trujillo*, 1938-NMSC-024, ¶ 15. Again, there is no basis under the *Gomez* factors to permit the creation of an interstitial constitutional right under Article II, Section 4 of the New Mexico Constitution. *See Gomez*, 1997-NMSC-006, ¶ 19.

**3.     The Exclusionary Defects in Plaintiffs' Proposed Right to Aid in Dying**

45

{44} Article II, Section 4 declares that "*All* persons . . . have certain natural, inherent and inalienable rights" entitled to protection. N.M. Const. art. II, § 4 (Emphasis added). In arguing that the genesis of aid in dying is rooted in Article II, Section 4, Plaintiffs identify two categories of bodily integrity as the basis for fundamental constitutional protection: (1) the "right to autonomous medical decision making" and (2) the right to "a dignified, peaceful death." But the fundamental constitutional protection being sought by Plaintiffs is not a right of autonomy or dignity shared or uniformly applied to all New Mexico citizens; it is a narrow interest only favoring certain patients who meet very specific criteria during their final days of life—competence, terminal illness, physical ability to take and swallow a pill, and who are under the current care and supervision of a physician who prescribes the lethal dosage of medication. Aid in dying also provides a very narrow benefit from prosecution that exclusively favors physicians. Despite repeatedly referring to aid in dying as the liberty interest of "all New Mexicans," the Dissenting Opinion ultimately concedes that it is a narrowly defined right and its narrowly tailored application is the "question at the heart of this case." *See* Dissenting Opinion ¶¶ 73, 133, 135 & 148.

{45} Plaintiffs' experts testified that in Oregon and Washington, patients who have ingested the medication are overwhelmingly white, married, college-educated,

46

insured, receiving hospice services, and dying of cancer or ALS. *See* Or. Pub. Health Div., Oregon's Death with Dignity Act Rep., at 4; Wash. State Dep't of Health, 2013 Death With Dignity Act Rep., at 1(2014). Plaintiffs do not assert that the same fundamental right exists for the remainder of New Mexicans who cannot meet the narrow definition for aid in dying. In addition, they do not claim that these excluded New Mexicans do not equally suffer from the same symptoms during the final six months of their lives—extreme pain, loss of autonomy, and loss of dignity, despite an absence of terminal illness. Under Plaintiffs' theory of substantive due process, the remainder of our citizens enduring the similar excruciating and unbearable symptoms are not entitled to equal constitutional protection. This theory would exclude the availability of aid in dying for all terminal patients suffering from a variety of disorders affecting their mental competence such as mental illness, dementia, or Alzheimer's disease. It would also exclude all patients suffering from non-terminal diseases or other medical conditions that are also causing extreme pain, indignity, and loss of autonomy during the final six months of their lives, such as multiple sclerosis and Parkinson's disease. *See* Mitchell, *supra*, at 60-61 (recognizing that a fundamental right to aid in dying may not be exercised by "people who are incapable of picking up . . . and/or swallowing the pills [by] themselves[,]" or by those "patients

47

suffering as the result of massive injuries or those inflicted with a wasting disease[,]" and noting that such patients "[may] be in a far worse position than those with terminal illness, e.g. six months or a year to live" because "[t]he suffering of non-terminal patients can go on and on, while, for the terminally ill, the end is in sight").

{46} Furthermore, Plaintiffs' narrowly defined asserted right to aid in dying would provide constitutional immunity from criminal prosecution to only physicians and no one else. For example, the asserted right would not protect a non-physician from criminal prosecution under Section 30-2-4 under a circumstance in which a patient who qualifies for aid in dying seeks assistance from a loved one in addition to or instead of a physician in achieving a peaceful and dignified death. This exclusionary benefit applying only to physicians further exposes the constitutional inadequacy of Plaintiffs' asserted right. Just as a fundamental right is one that exists for all citizens, any immunity from prosecution of third parties that springs from such a right, under properly applied principles of equal protection, must exist for *all* citizens who assist in carrying out a patient's constitutional right to hasten death. *See* N.M. Const. art. II, § 4; *see also Gentry v. Shug*, 2012-NMCA-019, ¶ 8, 270 P.3d 1286 ("An equal protection claim arises when a state actor treats similarly situated groups or persons differently."). We decline to conclude that a fundamental right exists where it would

protect only one class of citizens from criminal prosecution to the exclusion of all others.

{47} Under Article II, Section 4, we decline to recognize an inferred fundamental right benefitting only a select few New Mexicans. Fundamental constitutional rights that protect life, liberty, or happiness are "enjoyed by *all* New Mexicans[.]" *Griego*, 2014-NMSC-003, ¶ 1 (emphasis added); *see also Obergefell*, __ U.S. at __, 135 S. Ct. at 2599 (recognizing that marriage is a fundamental right "for *all* persons, whatever their sexual orientation" (emphasis added)). The selective discrimination embodied within Plaintiffs' concept of aid in dying is constitutionally unsound for recognition as a fundamental right embodied within Article II, Section 4 and does not protect all New Mexicans who have equal interests in dying with autonomy and dignity.

**D.     Whether Aid in Dying Is Protected by the New Mexico Constitution Under Plaintiffs' Other Theories**

{48} Plaintiffs challenged Section 30-2-4 in the district court under five independent claims. They claimed that Section 30-2-4 (1) does not prohibit aid in dying, (2) is unconstitutionally vague, (3) violates Article II, Section 18's equal protection guarantee, (4) violates Article II, Section 18's due process guarantee, and (5) violates Article II, Section 4's inherent rights guarantee. In addition to asserting that aid in

49

dying is a fundamental right requiring strict protection under our constitution's equal protection, due process, and inherent rights clauses, Plaintiffs asserted that Section 30-2-4's prohibition on aid in dying "is not substantially related to an important governmental interest[, or] . . . is not rationally related to firm legal rationale." Plaintiffs submitted proposed findings of fact and conclusions of law pertaining to all of these theories. In its decision, the district court did not address the second and third theories listed above. Further, the district court did not fully address Plaintiffs' fourth and fifth theories, whether Section 30-2-4 would pass an intermediate or a rational basis review in the event aid in dying was ultimately determined not to qualify as a fundamental right. It recognized in its final judgment that it did not need to address these other theories because it had concluded that aid in dying was a fundamental right and that Section 30-2-4 was subject to strict scrutiny review.

{49}     In applying its due process analysis under Article II, Section 18, the district court did not address whether aid in dying qualifies as the type of important individual interest entitled to heightened protection under intermediate scrutiny. *See Mieras v. Dyncorp*, 1996-NMCA-095, ¶ 26, 122 N.M. 401, 925 P.2d 518 (noting that important individual interests, although not fundamental, are entitled to a intermediate standard of constitutional review to test the application of the impinging

legislation); *Wagner v. AGW Consultants*, 2005-NMSC-016, ¶ 12 n.3, 137 N.M. 734, 114 P.3d 1050 (emphasizing that the intermediate scrutiny standard applies to "*either an important right or a sensitive class*, contrary to what we may have suggested in dicta in [previous cases]"); *see also Richardson v. Carnegie Library Rest., Inc.*, 1988-NMSC-084, ¶¶ 35-37, 107 N.M. 688, 763 P.2d 1153 (noting that heightened intermediate scrutiny allows a method of genuine judicial inquiry of important individual interests rather than the all-or-nothing choice between minimum rationality and strict scrutiny), *overruled on other grounds by Trujillo v. City of Albuquerque*, 1998-NMSC-031, 125 N.M. 721, 965 P.2d 305. "This level of evaluation is more sensitive to the risks of injustice than the rational basis standard and yet less blind to the needs of governmental flexibility than strict scrutiny." *Marrujo v. N.M. State Highway Transp. Dep't*, 1994-NMSC-116, ¶ 11, 118 N.M. 753, 887 P.2d 747 (internal quotation marks and citations omitted).

{50} Although the initial burden still rests upon a plaintiff to establish that the legislation at issue infringes upon an important individual interest, the state's burden of proof under an intermediate scrutiny analysis is different from the burden required under a strict scrutiny analysis. *Compare Breen*, 2005-NMSC-028, ¶ 13 (recognizing that the government bears the burden of proof under intermediate scrutiny to "prove

51

that the classification or discrimination caused by the legislation is substantially related to an important government interest" (internal quotation marks and citation omitted)), *with City of Albuquerque v. Pangaea Cinema, LLC*, 2012-NMCA-075, ¶ 29, 284 P.3d 1090 (recognizing that the government bears the burden of proof under strict scrutiny "to show that it has a compelling interest in the challenged scheme and that it has accomplished its goals by employing the least restrictive means"), *rev'd on other grounds*, 2013-NMSC-044, 310 P.3d 60; *see also Griego*, 2014-NMSC-003, ¶ 56 (applying intermediate scrutiny in an equal protection context and considering "whether the legislation is over- or under-inclusive in its application" and "whether the legislation is the least restrictive alternative for protecting the important governmental interest"); *Breen*, 2005-NMSC-028, ¶ 32 ("While the least restrictive alternative need not be selected if it poses serious practical difficulties in implementation, the existence of less restrictive alternatives is material to the determination of whether the [restriction] substantially furthers an important governmental interest." (alteration, internal quotation marks, and citation omitted)). The standard of proof differs even further when the district court applies rational basis testing. *See id.* ¶ 11 (recognizing that the party challenging the legislation bears the burden to prove that the statute is not rationally related to a legitimate

governmental purpose). The alternative standards of proof that were included in Plaintiffs' proposed findings and conclusions were not addressed by the district court in its original ruling and the corresponding findings that it entered. *See State ex rel. King v. UU Bar Ranch Ltd.*, 2009-NMSC-010, ¶ 44, 145 N.M. 769, 205 P.3d 816 ("When a trial court rejects proposed findings of facts or conclusions of law, we assume that said facts were not supported by sufficient evidence.").

{51} We have discretion under certain circumstances to resolve any issue raised on appeal, regardless of whether the district court had an opportunity to resolve that issue. *See* Rule 12-216(A) (limiting appellate scope of review to issues where it "appear[s] that a ruling or decision by the district court was fairly invoked," but granting appellate courts the discretion to consider unpreserved questions involving jurisdiction, general public interest, fundamental error, or fundamental rights of a party). However, we also have the discretion to remand a case to the district court to address alternative claims or theories raised by the parties that it declined to address at the trial level. *See Pruyn v. Lam*, 2009-NMCA-103, ¶ 17, 147 N.M. 39, 216 P.3d 804 (declining to address on appeal an alternative theory raised in the district court because the district court did not address the alternative theory and remanding the case to the district court to address that theory); *State ex rel. Children, Youth &*

*Families Dep't v. Frank G.*, 2005-NMCA-026, ¶ 40, 137 N.M. 137, 108 P.3d 543 ("The general rule in New Mexico for determining the finality of a judgment is whether all issues of law and fact have been determined and the case disposed of by the [district] court to the fullest extent possible." (internal quotation marks and citation omitted)).

{52} To the extent that aid in dying may be an important interest on par with other important interests recognized by our courts, such as the right to access the courts and the right to an appeal, *see Wagner*, 2005-NMSC-016, ¶ 14, and the right to run for elected office, *see Alvarez v. Chavez*, 1994-NMCA-133, ¶ 21, 118 N.M. 732, 886 P.2d 461, *overruled on other grounds by Trujillo v. City of Albuquerque*, 1998-NMSC-031, the district court should have analyzed Section 30-2-4 under intermediate scrutiny and determined whether the State has satisfied its lower burden of persuasion. Furthermore, it should have determined whether Section 30-2-4 passes a rational basis test as applied to aid in dying and have rendered a decision on Plaintiffs' remaining constitutional claims so as to avoid potential piecemeal appeals in this case.

{53} Although these and Plaintiffs' other alternative claims involve matters of profound public interest, *see* Rule 12-216, it is more appropriate in this case to

require the district court to render its decision on these claims and explain the grounds for those decisions prior to our review. The district court, as the sole fact finder in this case, was present for all of the testimony and arguments presented at trial. In considering the claims that it thought unnecessary to consider in the first instance, it will have an opportunity to make any additional factual findings that are more specific to the unaddressed issues and to require further hearings and/or briefing on these issues. Our Court is not in the position to make factual findings relevant to issues left unaddressed by the district court. *See generally Maloof v. San Juan Cnty. Valuation Protests Bd.*, 1992-NMCA-127, ¶ 17, 114 N.M. 755, 845 P.2d 849 ("The findings of fact adopted below, if supported by substantial evidence, are controlling on appeal."). Therefore, I would remand this case to the district court for further proceedings it deems necessary to result in the entry of findings of fact and conclusions of law concerning Plaintiffs' remaining claims.

**CONCLUSION**

{54}	We reverse the district court's ruling that aid in dying is a fundamental liberty interest under the New Mexico Constitution. Accordingly, we reverse the district court's order permanently enjoining the State from enforcing Section 30-2-4. We affirm the district court's determination that, for statutory construction purposes,

55

Section 30-2-4 prohibits aid in dying. Separate from the Concurring Opinion, I would also remand this case to the district court to make any further findings it deems necessary, to conduct both an intermediate scrutiny and rational basis review of Section 30-2-4, as well as dispose of Plaintiffs' remaining claims.

{55}     **IT IS SO ORDERED.**

_____

**TIMOTHY L. GARCIA, Judge**

**J. MILES HANISEE, Judge (concurring in part)**

**LINDA M. VANZI, Judge (dissenting)**

**HANISEE, Judge (concurring in part).**

{56}     I view the New Mexico Constitution to incorporate no *right*—fundamental or otherwise—to lethal narcotics medically prescribed for the sole purpose of causing the immediate death of a patient. I therefore concur in reversing the judgment of the district court, and join the majority conclusion that neither Article II, Sections 4 nor 18 constitutionalize aid in dying as a fundamental right in New Mexico. *See* Majority Op. ¶¶ 39, 43. I further agree that NMSA 1978, Section 30-2-4 prohibits aid in dying in New Mexico. *See* Majority Op. ¶ 20. I respectfully decline to join the perspectives of either of my colleagues that there is or may be some non-fundamental but otherwise constitutionally "important right" to aid in dying.[6] Accordingly, remand for further district court proceedings is unwarranted, *see also* Dissenting Op. ¶ 142, and I diverge from the Majority Opinion in this regard also. *See* Majority Op. ¶ 53. As well, I write separately to address my belief that a different branch of the tripartite structure that characterizes our governmental system is vastly better suited to consider and resolve the lawfulness of aid in dying in New Mexico than is the judiciary.

---

[6]The Dissenting Opinion would hold there to be a "fundamental, or at least important, liberty right to aid in dying." Dissenting Op. ¶ 104. The Majority author leaves open only the possibility that the lesser of such rights might be guaranteed by the New Mexico Constitution. Majority Op. ¶¶ 52-53.

57

{57}    In proposing to affirm the district court, the Dissenting Opinion would adjudicate New Mexico to be just the fourth state to legalize aid in dying, yet the *only* one to do so extra-statutorily and in a manner broadly circumventive of democratic processes.[7] Such a ruling would stand troublingly alone nationally, and would simultaneously contravene: (1) the United States Supreme Court's unanimous declaration that there is no such constitutional right; (2) the New Mexico Legislature's longtime prohibition of suicide assistance and far more recent establishment of end-of-life standards of medical care that expressly disallow aid in dying; and (3) principles of judicial reasoning that rarely compel, and even more rarely permit, the unilateral and permanent imposition of robed will upon coequal branches of government and society at large. The institution tasked with ensuring legal order ought to be measurably cautious before strong-arming into existence instant, precipitous, and profound social change.

**Aid in Dying Is Not A Fundamental Right**

{58}    I agree with the Majority Opinion's analysis holding there to be no Article II-derived fundamental right to aid in dying in New Mexico. First, Article II, Section 18

---

[7]While not affirmatively legalizing aid in dying, the Supreme Court of Montana held that "a terminally ill patient's consent to . . . aid in dying constitutes a statutory defense to a charge of homicide." *Baxter*, 2009 MT 449, ¶ 50.

58

safeguards our right to due process of law by language meaningfully indistinguishable from the federal Due Process Clause that was held by the United States Supreme Court *not* to provide a right to aid in dying. *See Glucksberg*, 521 U.S. at 728 ("[T]he asserted 'right' to assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause."). In order to conclude contrary to *Glucksberg*, we are first required to adhere to the narrow interstitial parameters our New Mexico Supreme Court applies when it is asked to depart from federal constitutional precedent. *See Gomez*, 1997-NMSC-006, ¶ 19 (permitting recognition of a right rejected for federal protection by "flawed federal analysis," or if arising from "structural differences between state and federal government" or New Mexico's "distinctive state characteristics"). Yet neither our nor some select legal critics' disagreement with established federal precedent, *see* Dissenting Op. ¶¶ 98-99 (citing scholarly opposition to *Glucksberg*), are the sort of determinants of legal "flaw" that I can embrace under *Gomez*.[8] The Majority Opinion's exclusion of aid in dying from those constitutional rights identified by

---

[8]Regarding the latter two *Gomez*-available bases for interstitial departure, nothing in the record of this case or the arguments of Plaintiffs illustrates structural governmental differences or distinctive state characteristics that lend support to a constitutional right to aid in dying in New Mexico.

59

process of interstitial analysis is correct, *see* Majority Op. ¶ 38, particularly given the United States Supreme Court's concise but timely supportive reference to *Glucksberg* in *Obergefell*. ___ U.S. at ___, 135 S. Ct. at 2602 (noting that *Glucksberg*'s "central reference to specific historic practices . . . may have been appropriate for the asserted right there involved (physician-assisted suicide)[, but] it is inconsistent with the approach [the United States Supreme Court] has used in discussing other fundamental rights, including marriage and intimacy"). It would be a mistake to disregard as dicta the Court's own recognition that not all interests asserted to be of constitutional dimension require identical analyses. *See Obergefell*, ___ U.S. at ___, 135 S. Ct. at 2602 (prohibiting the unequal disallowance of a recognized class of Americans from exercising a 48-year-long established fundamental constitutional right); *see also Loving*, 388 U.S. at 12 (declaring marriage to be "one of the vital personal rights essential to the orderly pursuit of happiness").

{59}     Secondly, among other inherent rights, Article II, Section 4 guarantees those of "enjoying and defending life and liberty[.]" *See Griego*, 2014-NMSC-003, ¶ 1. But our New Mexico Supreme Court has yet to hold this constitutional provision to be a fountain for as-yet-undiscovered rights, the implied geneses of which more typically spring from federal and/or state due process and equal protection clauses, such as

60

those within Article II, Section 18. *See Obergefell*, ___ U.S. at ___, 135 S. Ct. at 2602-03 ("The Due Process Clause and the Equal Protection Clause [interrelate] in a profound way [to] . . . further[] our understanding of what freedom is and must become."). This distinction is uniquely apropos to aid in dying, an asserted right that is functionally at odds with the enjoyment and defense of life, two of the very few stated interests Article II, Section 4 directly protects. *See* Majority Op. ¶¶ 40-43. In any event, even *Griego* mentions Article II, Section 4 in an introductory way, like our Constitution, then proceeds to conduct its constitutional inquiry pursuant to better established interpretive methodology. *Griego*, 2014-NMSC-003, ¶¶ 1, 25-27, 68.

**Aid in Dying Is Not An Important Right To Which Intermediate Scrutiny Applies**

{60}     It seems innately sensible that a constitutional right of any sort, even one that is non-fundamental but "important," must be meaningfully rooted within some specific protection afforded by the document being interpreted, or elsewhere by law. Yet the theoretical constitutional origin of an important such right does not automatically emerge from an otherwise flawed constitutional assertion. As noted above, the interest that is aid in dying is not merely one unmentioned by the New Mexico Constitution, but one that contradicts its very language and a first principle for which it stands. *See* N.M. Const. art. II, § 4 (declaring the enjoyment and defense

61

of life to be "natural, inherent and inalienable rights[.]"). Moreover, constitutionally "important right[s]" are those "certainly . . . more important and sensitive than rights restricted by primarily social . . . legislation." *State v. Druktenis*, 2004-NMCA-032, ¶ 98, 135 N.M. 223, 86 P.3d 1050. While it would be a mistake to coldly or cavalierly disregard the wishes of some who suffer from terminal illnesses, and for whom the enjoyment of life has been lost, the aid in dying interest presented by Plaintiffs to be a uniquely New Mexican constitutional right is neither absolute nor unqualified; that is, it is conditionally available to certain citizens but not to others. *See Lucero v. Salazar*, 1994-NMCA-066, ¶ 6, 117 N.M. 803, 877 P.2d 1106 (citing *Oldfield*, 1994-NMSC-005, ¶ 15, to advance the proposition that Article II, Section 4 is interpreted in a manner consistent with absolute and unqualified rights derived from the Fourteenth Amendment to the United States Constitution). To establish or leave open the possibility that this narrowest of interests is one of constitutional dimension disregards its predominant unavailability as well as its absence from and irresolvable squabble with our Constitution's language that instead expresses and emphasizes a diametrically opposite and equally available fundamental right: life's preservation.

{61} Furthermore, even were aid in dying suited for a determination of constitutional importance, it would squarely conflict with the State's own important

62

and legitimate contrary interests. *See Marrujo*, 1994-NMSC-116, ¶ 11 (holding that an "important—rather than fundamental—individual interest" yields to legislation that "substantially relate[s] to an important governmental interest")(internal quotation marks and citation omitted). Those include:

> preventing a person from taking the life of another; preventing suicide; preventing assisted suicide; promoting the integrity, healing, and life preserving principles of the medical profession; protecting vulnerable groups from unwanted pressure to considering aid in dying as the best alternative to other medical options; and promoting human life where aid in dying is not the appropriate medical option despite a patient's request for its use.

Majority Op. ¶ 37. It is difficult to envision legislation designed to foster indisputably legitimate state interests such as these to give way to a limited interest that is, as the Majority Opinion points out, societally undeveloped and within its legal infancy in state courts. *Id*. Of yet greater concern would be the dearth of any regulatory framework enforceable by the State to ensure the safety and efficacy of aid in dying were this judicial body to pronounce its legality. Unlike the three states that have *legislatively* permitted aid in dying, its practice in New Mexico would occur in a void only minimally filled by externally written and questionably enforceable "professional standards of practice" or some alternately nebulous "established standard of care." Dissenting Op. ¶¶ 126, 127. In fact, the best examples of why the

63

more capably informed legislative process is the superior means by which aid in dying might achieve legality are the three statutory enactments existing nationally. *See* Or. Rev. Stat. Ann. §§ 127.800 to .897; Vt. Stat. Ann. tit. 18, §§ 5281 to 5292; Wash. Rev. Code Ann. §§ 70.245.10 to .904. Each not only provides a framework to actuate aid in dying, but also defines physician responsibilities, reporting requirements, and procedural processes. *Id*. Importantly, each state imposes criminal liability on individuals who engage in varying degrees of malfeasance with regard to aid in dying. *See* Wash. Rev. Code Ann. § 70.245.200; Or. Rev. Stat. Ann. § 127.890 § 4.02; Vt. Stat. Ann. tit. 18, § 5283(b). Such a patient-safety-driven framework, codifying a deterrent threat of criminal liability should lives be prematurely, wrongly, or improperly ended in violation of statutorily pre-defined safeguards, is altogether absent in New Mexico. And it is not the judiciary's place to assume the legislative role necessary to enact some regulatory substitute for that which should accompany and govern any such fundamental transformation in medical caregiving. I consider a New Mexico courthouse to be perhaps the least suitable venue to determine whether the foundational healing tenet of medical care—the Hippocratic Oath—is to be abruptly disregarded, even in the laudable context of attempting to alleviate the suffering of dying patients.

64

{62}     Notably also, aid in dying negates not one but *three* contrary expressions of law passed by our citizen legislature, the constitutional branch of government elected by New Mexicans to represent their perspectives as lawmakers. *See* § 30-2-4; §§ 24-7A-1 to -18 (Uniform Health Care Decisions Act); §§ 24-7B-1 to -16 (Mental Health Care Treatment Decisions Act). *See also Glucksberg*, 521 U.S. at 720 ("By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action."). To substitute our judgment for that underpinning laws written by the New Mexico Legislature and enacted by a governor's signature would serve to disrupt the considered order by which society is governed. *See Baxter*, 2009 MT 449, ¶ 117 (Rice, J., dissenting) ("Controlling their own destiny, Montanans may decide to change the [s]tate's public policy. . . . This [c]ourt should allow [its citizens] . . . to control their own destiny on [aid in dying]."). Such is particularly true when the newfound right arises from inexact, directly contrary, ethereal, or otherwise indefinite language. Our Constitution was not meant to be molded and stretched to exclusively afford a right of any sort to so few of the many protected by the same enduring and all-encompassing document. *See Griego*, 2014-NMSC-003, ¶¶ 53, 68-69 (declaring

unconstitutional statutes that preclude a "discrete group" of New Mexico citizens from engaging in an activity afforded to another group).

{63} Regarding intermediate scrutiny, *Griego* is our New Mexico Supreme Court's most recent topical jurisprudence. Prior to *Obergefell*'s ruling that same-sex marriage is protected by the United States Constitution, *Griego* applied intermediate scrutiny to hold that same-gender couples in New Mexico cannot be denied the "rights, protections and responsibilities of civil marriage solely because of their sexual orientation." *Griego*, 2014-NMSC-003, ¶ 6. But three circumstances distinguish *Griego* from the issue before us. First, *Griego* made clear that "none of [the] New Mexico[] marriage statutes specifically prohibit same-gender marriages"; however, each "reflect[ed] a legislative intent" to do so. 2014-NMSC-003, ¶¶ 4, 23. Here, Section 30-2-4 expressly criminalizes "deliberately aiding another in the taking of his [or her] own life[,]" a prohibition twice reiterated in ensuing legislation regarding end of life medical care. *See also* §§ 24-7A-13(C); 24-7B-15(C) (each expressly refusing to "authorize . . . assisted suicide . . . to the extent prohibited by other statutes of this state"). Second, unlike the situation before us where the United States Supreme Court has held there to be no fundamental liberty interest in "assistance in committing suicide[,]" *Glucksberg*, 521 U.S. at 728, our New Mexico Supreme Court in *Griego*

66

recognized that the question before it was one that had at the time "not been answered by the United States Supreme Court" and declined to address fundamentality. *Griego*, 2014-NMSC-003, ¶ 54. Third and most importantly, the result in *Griego* was based upon application of the New Mexico Human Rights Act (NMHRA), NMSA 1978, §§ 28-1-1 to -15 (1969, as amended through 2007) (recognizing "sexual orientation as a class of persons protected from discriminatory treatment") in conjunction with the "equality demanded by the Equal Protection Clause of the New Mexico Constitution." *Griego*, 2014-NMSC-003, ¶¶ 42, 68 (internal quotation marks and citation omitted). Almost needless to say, the NMHRA is silent on "terminally ill" as a protected class.

{64} With no sensitive class or equal protection consideration like was present in *Griego*, application of intermediate scrutiny in this instance can only be premised upon the identification of aid in dying as a freshly minted constitutionally important right. *See Wagner*, 2005-NMSC-016, ¶ 12 n.3 (application of intermediate scrutiny "requires *either* an important right *or* a sensitive class") (emphasis in original). If found to be such, aid in dying would immediately violate the very equality of application demanded of rights guaranteed by the New Mexico Constitution. One class of citizens—terminally ill, mentally competent adults—would possess a right that would be denied to other similarly but not identically situated New Mexicans at

67

the end of their lives.[9] New Mexico courts should be particularly wary of constitutionalizing interests that would be unavailable to inexactly situated members of the broader public at the end of their lives. *See Quill*, 521 U.S. at 799 (rejecting equal protection challenge to New York's statutes banning aid in dying that apply to "*all* New Yorkers alike [and do not] . . . infringe fundamental rights [or] suspect classifications." (emphasis added)). Likewise, the constitutional infirmity of protecting some New Mexicans (physicians) but not others (family members of terminally ill patients) from Section 30-2-4's reach is to me starkly apparent. *See also* Majority Op. ¶ 44.

**Section 30-2-4 Is Reasonably Related To A Legitimate Government Purpose**

{65}     A constitutional challenge to governmental interference with an asserted right bestirs a process of review both federally and in New Mexico whereupon courts "decide what interest is involved or to whom the interest belongs[,]" *Marrujo*, 1994-

---

[9]A right to aid in dying available only to a minute sector of the population would seem markedly in conflict with bedrock constitutional principles that guarantee equality of rights. Yet to apply principles of equal protection to any future right to aid in dying, as courts will inevitably be asked to do, seems as well fraught with peril. *See* Rachel Aviv, *Letter From Belgium, The Death Treatment: When should people with a non-terminal illness be helped to die?*, The New Yorker, (June 22, 2015), *available at* http://www.newyorker.com/magazine/2015/06/22/the-death-treatment (questioning the practice of aid in dying generally and specifically its expansion to the contexts of mental illness and dementia in Belgium).

NMSC-116, ¶ 9, ascertain state interest in prohibiting or curtailing the asserted right, *Griego*, 2014-NMSC-003, ¶¶ 56-62 (identifying and rejecting the state's interest in denying same gender couples the right to marry), and apply whichever of three ensuing standards of legal scrutiny is warranted to fairly balance the interests of the proponent with those of the State: strict, intermediate, or "rational basis." *Marrujo*, 1994-NMSC-116, ¶¶ 9-12 (explaining each standard of review and stating that in New Mexico "the same standards of review are used in analyzing both due process and equal protection guarantees"). The rational basis test is "triggered by . . . interests . . . that are not fundamental rights, suspect classifications, important individual interests, [or] sensitive classifications." *Id*. ¶ 12. "The burden is on the opponent of the legislation to show that the law lacks a reasonable relationship to a legitimate governmental purpose." *Id*. (internal citation omitted). The test applies in circumstances of "personal activities that are not fundamental rights." *Id*. Aid in dying is such an activity, and is subject to rational basis review.

{66} To justify its ban on aid in dying, the State relies on many of the same "unquestionably important and legitimate" governmental interests identified to be valid by *Glucksberg*: (1) preserving life; (2) "protecting the integrity and ethics of the medical profession"; (3) "ensuring adequate regulation of the practice"; and (4)

69

preventing suicide and treating its causes. 521 U.S. at 703, 729-35. Without "weigh[ing] exactly the relative strengths of these various interests," *Glucksberg* concluded Washington's prohibition of "assisting another in the commission of self-murder[,]" to be "at least reasonably related to their promotion and protection." *Id.* at 707, 735 (internal quotation marks omitted). Therefore, pursuant to rational basis review, the Washington statute did not violate the Fourteenth Amendment. *Id.* at 735; *see also Marrujo*, 1994-NMSC-116, ¶ 12 ("The opponent's burden is difficult because they must demonstrate that the challenged legislation is clearly arbitrary and unreasonable, not just possibly so. The court will uphold the statute if any state of facts can be discerned that will reasonably sustain the challenged [legislation.]" (internal quotation marks and citation omitted)). Here, Section 30-2-4 prohibits "deliberately aiding another in the taking of his [or her] own life" in a manner nearly identical to the State of Washington, and New Mexico's own recognized governmental interests align with those determined to be valid by *Glucksberg*. Accordingly, I would conclude that Section 30-2-4 is rationally related to a legitimate government purpose. Both it and the ensuing statutory enactments that define the parameters of medical decision-making reiterate the disallowance of aid in dying in New Mexico, and warrant the "traditional deference accorded by courts to the

70

legislature's sense of the general good" emphasized by *Marrujo* in its discussion of rational basis review. 1994-NMSC-116, ¶ 12 (internal quotation marks and citation omitted). The determination that Section 30-2-4 withstands rational basis review as a matter of law should be part of our holding today.

{67} Lastly, I note that the rational basis test reflects the deference owed by our third branch of government when legislative and executive processes combine to produce laws that govern society. Our uneven decision today amply illustrates why those processes provide better answers to societal questions such as the legality or illegality of aid in dying. Pursuant to them, the New Mexico Legislature may, upon consultation with constituents and citizens, study and propose any bill it deems to be in the best interest of New Mexicans. If such legislation withstands the rigors of bicameral scrutiny, it is next subjected to executive review, after which a governor may sign or veto it. By this exacting process, the people of our state speak to declare their wishes. If an ensuing enactment is legally challenged, courts are then far better positioned to exercise their constitutional role in a properly judicial context.

**CONCLUSION**

{68} It can be difficult to repress—as judges sometimes must—the innately human inclination to act when invited to provide a decisional option in circumstances where

71

options are sadly few. By declining such an invitation today, I mean not to assail aid in dying or to thwart what Plaintiffs hope to accomplish for gravely ill New Mexicans. The role of the judiciary is not always to determine a victor between competing extremes, particularly when answers to questions of law are attainable on narrower grounds. *See Allen v. LeMaster*, 2012-NMSC-001, ¶ 28, 267 P.3d 806 (citing *Baca v. N.M. Dep't of Pub. Safety*, 2002-NMSC-017, ¶ 12, 132 N.M. 282, 47 P.3d 441, for the proposition that "courts exercise judicial restraint by deciding cases on the narrowest possible grounds and avoid reaching unnecessary constitutional issues"). Those that may be disappointed or pleased by today's decision should also know that three judges can no more disavow aid in dying as a movement gathering public momentum than we should today stifle the deeply held beliefs and countervailing efforts of those that exercise their right to oppose it.

{69}     The question before this panel is not whether aid in dying *should* be legal, nor whether it *can* be legalized in a manner consistent with the New Mexico Constitution; we must simply answer whether the legality of aid in dying is constitutionally *compulsory*. It is not. The correct answer does not spring from our own individual or collective "policy preferences [as m]embers of this Court," *Glucksberg*, 521 U.S. at 720, but from our informed fidelity to constitutional precedent, institutionally

72

advisable notions of restraint, required respect for the roles of co-equal branches of government, and awareness of the often arduous, and yet enduring, people-driven process by which societies evolve within our nation's immortality-minded experiment in democracy. *See Schuette v. BAMN*, ___ U.S. ___, 134 S. Ct. 1623, 1636-37 (2014) (noting by plurality the "right of citizens to debate so they can learn and decide and then, through the political process, act in concert to try to shape the course of their own times"). Inevitably, the value of rights chosen by citizens will exceed that of rights prematurely directed by judges. To spare aid in dying that which is normally required to effectuate significant change to New Mexico law would deprive it of both the legitimacy of public inclusion and the opportunity for consensus invaluable to the determinative process. *See Obergefell*, ___ U.S. at ___, 135 S. Ct. at 2605 (noting with approval the "referenda, legislative debates, and grassroots campaigns, as well as countless studies, papers, books, and other popular and scholarly writings [alongside] extensive litigation in state and federal courts" regarding same-sex marriage). Such would also wrongly short-change citizens across our state who wish to voice their opinion prior to being told the outcome of matters about which they care. Our preference today simply does not belong alongside historic, hard won, and

transcendent rights that warrant constitutional guarantee to the exclusion of countervailing governmental interests.

{70} Based on my agreement that the New Mexico Constitution provides no fundamental right to aid in dying, I concur in the Majority Opinion's reversal of the district court's final declaratory judgment and order of permanent injunction. I would extend our ruling to additionally conclude that aid in dying is not a constitutionally protected important right or interest. Lastly, I would uphold Section 30-2-4 pursuant to the rational basis standard of review.

_____

**J. MILES HANISEE, Judge**

**VANZI, Judge (dissenting).**

{71} The question presented is whether NMSA 1978, Section 30-2-4 (1963) may constitutionally be applied to criminalize a willing physician's act of providing "aid in dying" at the request of a mentally competent, terminally ill patient who wishes a peaceful end of life as an alternative to being forced to endure an unbearable dying process marked by suffering, including extreme pain and/or the loss of autonomy and dignity. I would hold that it may not and would therefore affirm the district court's order permanently enjoining the State from prosecuting under Section 30-2-4 any physician who provides aid in dying in accordance with the parties' agreed definition. I present my analysis in full, save for my recitation of the factual record and statutory interpretation, regardless of any repetition with portions of the majority opinion.[10]

**I.    BACKGROUND**

{72} Plaintiffs contend that the right to aid in dying is "fundamental or, at the very least, important under the New Mexico Constitution." I understand the parties' agreed definition of "aid in dying" to limit the right such that it is implicated only where: (1) a mentally competent adult who is capable of giving consent, and (2) who is terminally ill with a grievous and irremediable medical condition, (3) chooses to

---

[10]A certain amount of redundancy is unavoidable because the majority opinion tracks some of my analysis and presentation of the relevant law.

request a prescription for medication that may be ingested to bring about a painless, peaceful, and dignified end of life, and (4) a willing physician applying the established standard of care for aid in dying determines that it would be appropriate to provide such medication so that the requesting patient need not be forced to endure an intolerable dying process marked by suffering, including extreme pain and/or loss of autonomy and dignity. All references to "aid in dying" herein assume and encompass the full scope of the foregoing definition.

{73}    I pause to address the majority and concurring opinions' attempt to use these limitations in support of the argument that there is no fundamental right to aid in dying, suggesting that recognizing the right would somehow be an act of "selective discrimination" because only "a select few" would have it and because it "also provides a very narrow benefit from prosecution that exclusively favors physicians." *See* Majority Op. ¶¶ 44-47 (referring to the limitations as "exclusionary defects"); *see also* Concurring Op. ¶¶ 62, 64. The contention is untenable. The right to aid in dying, which I would hold is protected under our Constitution, belongs to *all* New Mexicans. The fact that it may be invoked only by some people who find themselves in certain circumstances is also true of other constitutional rights. The parental autonomy rights recognized by the Constitution (discussed below) apply to all citizens, even though

76

not all citizens will exercise them. So too, the reproductive autonomy rights to use contraception and to terminate a pregnancy belong to every citizen, notwithstanding that every citizen might not be in a situation that would bring about their exercise. The right to terminate a pregnancy, moreover, cannot be exercised beyond a certain point in the pregnancy. Viability marks "the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions"; before then, "the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 835, 846 (1992). Those who are on life support have the constitutional right to have their lives ended, although not everyone will be on life support. *See Cruzan ex rel. Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 279, 287, 302, 344 (1990) (majority opinion assumed that "a competent person [has] a constitutionally protected right to refuse lifesaving hydration and nutrition"; five Justices concluded that there is a due process right to refuse medical treatment). And there is a fundamental right to marry, even though not everyone will claim it. All asserted rights must be considered in the context in which the allegedly protected conduct takes place. The right to aid in dying is no different in this respect. The fact

that the right is exercised in a specific context, during a limited time period, does not defeat its existence. Nor is the recognition of the right precluded because it would protect physicians who provide aid in dying from prosecution but not non-physicians. For one thing, Plaintiffs do not assert a right to the assistance of anyone but a physician in providing aid in dying. For another, the protection of physicians from criminal liability in this context is required for the same reasons it is required in any context in which the assistance of a physician is necessary (under the medical standard of care or otherwise) to effectuate the constitutional right of the patient. As discussed below, the patient's choice and the assistance of the physician to actualize it are both protected. This does not vitiate the right asserted here any more than it does the right to terminate a pregnancy, or to administer terminal sedation, or withdraw life sustaining medication and equipment.

{74}    Plaintiffs invoke two provisions of the New Mexico Constitution: the due process clause of Article II, Section 18, which has an analogous provision in the United States Constitution, and the inherent rights guarantee of Article II, Section 4, which has no federal constitutional analogue. The State made no attempt below to justify Section 30-2-4 as necessary to serve a compelling governmental interest (as it must if the right is "fundamental") or a substantial governmental interest (which it

must if the right is "important"). Instead, relying on a single federal decision, *Washington v. Glucksberg*, 521 U.S. 702 (1997), it argued that the statute is constitutional as applied to aid in dying because it is rationally related to a legitimate governmental interest.

{75} The district court concluded that Section 30-2-4, as applied to aid in dying, violates Article II, Section 4 and Article II, Section 18 of the New Mexico Constitution. Citing *Glucksberg*, 521 U.S. at 725, the court acknowledged that the United States Supreme Court had previously "declined to find the right to aid in dying to be . . . protected by the federal Constitution." The court nevertheless departed from federal precedent. Noting that New Mexico has inherent power as a separate sovereign in our federalist system to provide more liberty than that afforded by the federal Constitution and applying the interstitial approach to constitutional analysis, *see State v. Gomez*, 1997-NMSC-006, ¶ 19, 122 N.M. 777, 932 P.2d 1, the district court concluded that Article II, Section 4 provides "distinct additions" to the rights afforded by the federal Constitution and a basis to diverge from federal precedent.

{76} The district court held that "[a] terminally ill, mentally competent patient has a fundamental right to choose aid in dying pursuant to the New Mexico Constitution's guarantee to protect life, liberty, and seeking and obtaining happiness, N.M. Const.

79

art. II, § 4, and its substantive due process protections, N.M. Const. art. II, § 18." Applying strict scrutiny, the court held that the State had failed to prove that Section 30-2-4 furthers a compelling interest by criminalizing physician aid in dying and ordered that the State is permanently enjoined from prosecuting any physician who provides aid in dying to mentally competent, terminally ill patients.

{77} On appeal, the State argues that: (1) there is no fundamental constitutional right to the deliberate assistance of a third party in ending one's own life; and (2) the district court's ruling violates the doctrine of separation of powers by legalizing conduct that was designated as a crime by the Legislature. Here, as in the district court, the State makes no attempt to justify Section 30-2-4's proscription against aid in dying as necessary to serve a compelling or substantial state interest; relying on *Glucksberg*, it asserts it does not have to. Our review is de novo. *Bank of N.Y. v. Romero*, 2014-NMSC-007, ¶ 52, 320 P.3d 1.

## II. DUE PROCESS

{78} The due process clause of the New Mexico Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law[.]" N.M. Const. art. II, § 18. The federal due process clause similarly provides that no state "shall . . . deprive any person of life, liberty, or property, without due process

80

of law[.]" U.S. Const. amend. XIV, § 1. Plaintiffs do not claim a right to aid in dying under federal law, but the State's argument that there is no such right assumes that the result in this case is dictated by *Glucksberg*, 521 U.S. at 728, which held that "the asserted 'right' to assistance in committing suicide is not a fundamental liberty interest protected by the [federal] Due Process Clause" and that "Washington's assisted-suicide ban [is] rationally related to legitimate government interests." The majority and concurring opinions also assume that *Glucksberg* is dispositive here. I begin with a review of the key United States Supreme Court decisions interpreting the liberty interest protected by the federal due process clause.

## A.    Federal Due Process Precedents

{79}    Long before it decided *Glucksberg*, the United States Supreme Court interpreted the substantive component of the due process clause to protect aspects of personal autonomy as "fundamental rights," notwithstanding that they are not mentioned in the text of the Bill of Rights, with which the government may not interfere unless it meets its burden under the strict scrutiny standard to prove that the infringing statute is narrowly tailored to serve a compelling governmental interest. *See Casey*, 505 U.S. at 847 (explaining that the United States Supreme Court has never accepted the view that "liberty encompasses no more than those rights already

81

guaranteed to the individual against [governmental] interference by the express provisions of the first eight Amendments to the Constitution").

{80} These previously recognized fundamental rights include the right to marry, *see Loving v. Virginia*, 388 U.S. 1, 2 (1967), and aspects of parental autonomy, *see, e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (recognizing the rights to the companionship, care, custody, and management of one's children); *Stanley v. Illinois*, 405 U.S. 645, 651-52 (1972) (preserving the right to conceive, raise, and retain custody of one's children); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942) (decided on equal protection grounds, emphasizing the "fundamental" nature of individual choice about procreation and the corresponding standard of "strict scrutiny"); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925) (recognizing the right to raise one's children); *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923) (discussing the parental right to control children's education). The Court has also recognized a fundamental due process right to bodily integrity. *See Casey*, 505 U.S. at 849 (citing *Washington v. Harper*, 494 U.S. 210, 221-22 (1990); *Winston v. Lee*, 470 U.S. 753 (1985); *Rochin v. California*, 342 U.S. 165 (1952)).

{81} The Court has held that there is a fundamental due process right to reproductive autonomy, which includes the right to purchase and use contraceptives, *see Griswold*

*v. Connecticut*, 381 U.S. 479, 499 (1965) (recognizing a married couple's privacy right in their intimate relationship); *Eisenstadt v. Baird*, 405 U.S. 438, 443-44 (1972) (extending *Griswold*, under the Equal Protection Clause, to invalidate a state law against distributing contraceptives to unmarried persons), and the right to terminate a pregnancy, *see Roe v. Wade*, 410 U.S. 113, 165-66 (1973); *Casey*, 505 U.S. at 833. In *Roe* and its progeny, the Court recognized and then affirmed the right of a woman to choose whether or not to terminate her pregnancy, reasoning primarily from the personal nature of the decision and its consequences, which are best left to "the woman and her responsible physician." 410 U.S. at 153; *see Casey*, 505 U.S. at 846 (affirming *Roe*'s central holding).

{82} Writing separately in *Roe* and its companion case, *Bolton*, Justice Douglas broadly described, among other liberties, a "freedom to care for one's health and person[.]" *Doe v. Bolton*, 410 U.S. 179, 213 (1973) (Douglas, J., concurring). These cases establish that individuals have an "interest in independence in making certain kinds of important decisions[,]" *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977) (footnote omitted); *see Carey v. Population Servs. Int'l*, 431 U.S. 678, 684-85 (1977), and that "[i]t is a promise of the Constitution that there is a realm of personal liberty which the government may not enter[,]" *Casey*, 505 U.S. at 847. This interest in self-

definition, which is "the heart of liberty," is no less than "the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Id.* at 851. *Casey* described *Roe* "not only as an exemplar of *Griswold* liberty but as a rule . . . of personal autonomy and bodily integrity, with doctrinal affinity to cases recognizing limits on governmental power to mandate medical treatment or to bar its rejection." *Casey*, 505 U.S. at 857.

{83} Substantive due process decisions pre-dating *Glucksberg* also clearly recognized, as part of the protected liberty interest, the right to the necessary assistance of a physician. In *Carey*, 431 U.S. at 684-90, the Court emphasized, in holding that restrictions on the distribution of contraceptives must satisfy strict scrutiny because they clearly burden the fundamental right to make decisions concerning reproduction, that strict scrutiny also applies to state regulations that burden the fundamental right to make such decisions "by substantially limiting access to the means of effectuating that decision." And the decisions in *Roe* and *Casey* held that the right encompasses the assistance of a physician necessary to exercise it, "vindicat[ing] the right of the physician to administer medical treatment according to his professional judgment up to the points where important state interests provide compelling justifications for intervention." *Roe*, 410 U.S. at 165-66. "If an individual

84

practitioner abuses the privilege of exercising proper medical judgment, the usual remedies, judicial and intra-professional, are available." *Id.* at 166.

{84}    *Casey* further clarified that, although "[i]t is . . . tempting . . . to suppose that the Due Process Clause protects only those practices, defined at the most specific level, that were protected against government interference by other rules of law when the Fourteenth Amendment was ratified . . . such a view would be inconsistent with our law." 505 U.S. at 847; *see also Rochin*, 342 U.S. at 171 ("To believe that this judicial exercise of judgment could be avoided by freezing 'due process of law' at some fixed stage of time or thought is to suggest that the most important aspect of constitutional adjudication is a function for inanimate machines and not for judges[.]").

{85}    In *Cruzan*, 497 U.S. at 278, the Court stated that "[t]he principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions" and "assume[d] that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition." *Id*. at 279; *see id.* at 281 ("[T]he Due Process Clause protects . . . an interest in refusing life-sustaining medical treatment."). As Justice O'Connor explained in her concurring

85

opinion, "The State's imposition of medical treatment on an unwilling competent adult necessarily involves some form of restraint and intrusion. A seriously ill or dying patient whose wishes are not honored may feel a captive of the machinery required for life-sustaining measures or other medical interventions. Such forced treatment may burden that individual's liberty interests as much as any state coercion. The State's artificial provision of nutrition and hydration implicates identical concerns." *Id.* at 288 (O'Connor, J., concurring) (citations omitted). "Requiring a competent adult to endure such procedures against her will burdens the patient's liberty, dignity, and freedom to determine the course of her own treatment. Accordingly, the liberty guaranteed by the Due Process Clause must protect, if it protects anything, an individual's deeply personal decision to reject medical treatment, including the artificial delivery of food and water." *Id.* at 289 (O'Connor, J., concurring).

{86} In *Bowers v. Hardwick*, 478 U.S. 186, 190-91 (1986), *overruled by Lawrence v. Texas*, 539 U.S. 558 (2003), the Court did an about-face, rejecting the substantive due process analysis it had previously applied in addressing fundamental rights. Recasting the respondent's claim as an asserted "fundamental right to engage in homosexual sodomy," *id.* at 191, the Court dismissed the right as "at best, facetious,"

86

because homosexual sodomy was not "deeply rooted in this Nation's history and tradition." *Id.* at 192, 194 (internal quotation marks and citation omitted). In *Glucksberg*, the Court applied the same tactics, redefining the right asserted and rejecting it for lack of a "deeply rooted" historical antecedent. Before examining *Glucksberg*, I consider the Court's most recent substantive due process decisions, which make plain that the *Bowers*/*Glucksberg* analysis does not control substantive due process analysis as a matter of federal constitutional law.

{87}     In *Lawrence*, the Court overruled *Bowers*, emphatically rejecting its narrow characterization of the right at issue and its rigid adherence to, and exclusive focus on, an historical analysis in deciding substantive due process claims. *Lawrence*, 539 U.S. at 567, 577-78. The *Lawrence* Court adopted Justice Stevens' dissent in *Bowers*, which recognized that "the fact that the governing majority in a [s]tate has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice[.]" *Lawrence*, 539 U.S. at 577-78 (internal quotation marks and citation omitted). Stating that "[t]he issue is whether the majority may use the power of the [s]tate to enforce these views on the whole society through operation of the criminal law[,]" the *Lawrence* Court embraced *Casey*, quoting its statement that the Court's " 'obligation is to define the liberty of all, not to mandate

87

our own moral code[,]' " and its formulation of the due process liberty interest as protecting "the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Lawrence*, 539 U.S. at 571, 574 (quoting *Casey*, 505 U.S. at 850-51).

{88} *Bowers*, the *Lawrence* Court held, "was not correct when it was decided, and it is not correct today." *Lawrence*, 539 U.S. at 578. Reiterating *Casey*'s pronouncement that " '[i]t is a promise of the Constitution that there is a realm of personal liberty which the government may not enter[,]' " *Lawrence*, 539 U.S. at 578 (quoting *Casey*, 505 U.S. at 847), *Lawrence* concluded,

> Had those who drew and ratified the Due Process Clauses . . . known the components of liberty in its manifold possibilities, they might have been more specific. They did not presume to have this insight. They knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom.

*Id.* at 578-79.

{89} The Court cemented its rejection of a rigid historical analysis as dispositive of substantive due process rights in *Obergefell v. Hodges*, ___ U.S. ___, 135 S. Ct. 2584 (2015), in which the Court held that the federal due process clause protects a liberty interest in marrying a person of the same sex and requires states to license and

recognize such marriages. *See id.* at 2604-05, 2608. The Court explained that the liberty interests protected by the federal due process clause "extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs[,]" *id.* at 2597 (citing *Eisenstadt*, 405 U.S. at 453; *Griswold*, 381 U.S. at 484-86), and that "[t]he identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution[,]" *id.* at 2598. The Court emphasized that the task of fulfilling that judicial responsibility "has not been reduced to any formula," but rather "requires courts to exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect." *Id.* (internal quotation marks and citation omitted). "History and tradition guide and discipline this inquiry but do not set its outer boundaries." *Id.* (citing *Lawrence*, 539 U.S. at 572). The proper method of analysis "respects our history and learns from it without allowing the past alone to rule the present." *Id.* The Court reasoned:

> The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a chapter protecting the right of all persons to enjoy liberty as we learn its meaning. When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed.

*Id.*

**B.** *Washington v. Glucksberg*

{90} In *Glucksberg*, which was decided after *Bowers* but before *Lawrence* and *Obergefell*, an alliance of physicians and terminally ill patients sought a declaration that a Washington statute criminalizing "promoting a suicide attempt," defined as "knowingly caus[ing] or aid[ing] another person to attempt suicide," violated the federal due process clause. *Glucksberg*, 521 U.S. at 707-08 (internal quotation marks and citation omitted). The plaintiffs had asserted "a liberty interest protected by the Fourteenth Amendment which extends to a personal choice by a mentally competent, terminally ill adult to commit physician-assisted suicide." *Id.* at 708 (internal quotation marks and citation omitted). The Supreme Court recast the issue as "whether the 'liberty' specially protected by the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so[,]" *id.* at 723, and restricted its inquiry to whether that right had previously been recognized in the course of "our Nation's history, legal traditions, and practices," *id.* at 710, 721. The Court concluded that a " 'right' to assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause" because "[t]he history of the law's treatment of assisted suicide in this country has been and

continues to be one of the rejection of nearly all efforts to permit it." *Id.* at 728. Having declined to recognize a fundamental right, the Court went on to hold the State's asserted interests to be sufficient to withstand the immediate challenge under rational basis review. *Id.*

{91} The Court distinguished *Cruzan* on the ground that the right the Court assumed existed in that case was rooted in "the common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to refuse unwanted medical treatment," and thus "was entirely consistent with this Nation's history and constitutional traditions," while "[t]he decision to commit suicide with the assistance of another . . . has never enjoyed similar legal protection." *Glucksberg*, 521 U.S. at 725. The Court characterized the broad, rights-protective language of *Casey* as a general description of personal activities that had previously been identified as "so deeply rooted in our history and traditions, or so fundamental to our concept of constitutionally ordered liberty, that they are protected by the Fourteenth Amendment[,]" concluding without analysis that the fact that "many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected[.]" *Glucksberg*, 521 U.S. at 727-28.

{92} Five Justices wrote separately, reserving the possibility that the Court might recognize a constitutional right to "physician-assisted suicide" in certain circumstances, while relying on different grounds and different reasoning. Justice Stevens concurred in the result, explaining that all of the patient plaintiffs had died during the litigation and that the majority opinion held that "Washington's statute prohibiting assisted suicide is not invalid 'on its face[.]' " *Id.* at 739 (Stevens, J., concurring). Justice O'Connor joined the majority opinion "because [she] agree[d] that there is no generalized right to 'commit suicide[,]' " stating that there was no need to reach "the narrower question whether a mentally competent person who is experiencing great suffering has a constitutionally cognizable interest in controlling the circumstances of his or her imminent death" in the context of what she characterized as the facial challenges presented in *Glucksberg* and the related case, *Vacco v. Quill*, 521 U.S. 793 (1997).[11] *Glucksberg*, 521 U.S. at 736 (O'Connor, J., concurring). Justice Ginsburg concurred "substantially for the reasons stated by Justice O'Connor." *Id.* at 789 (Ginsburg, J., concurring). Justice Breyer also joined Justice O'Connor's opinion, "except insofar as it joins the majority[,]" writing

[11]In *Quill*, the Supreme Court held that New York's similar ban did not deprive a similarly defined class of persons of equal protection, despite the state's recognition and protection of the right of each patient in the class to refuse lifesaving medical treatment. 521 U.S. at 796-97.

92

separately to say that our legal tradition might protect a "right to die with dignity," at the core of which "would lie personal control over the manner of death, professional medical assistance, and the avoidance of unnecessary and severe physical suffering—combined[,]" and to emphasize that terminally ill patients experiencing "severe physical pain" might have a constitutionally protected interest. *Id.* at 789-91 (Breyer, J., concurring) (internal quotation marks omitted). Taking a completely different approach, Justice Souter stated that "the importance of the individual interest here, as within that class of 'certain interests' demanding careful scrutiny of the State's contrary claim, cannot be gainsaid[,]" but did not reach the question whether "that interest might in some circumstances, or at some time, be seen as 'fundamental' to the degree entitled to prevail" because he was "satisfied that the State's interests . . . [we]re sufficiently serious to defeat the present claim that its law is arbitrary or purposeless." *Id.* at 782 (Souter, J., concurring) (citation omitted).

{93}     Thus, Justices O'Connor and Stevens, and Justices Ginsburg and Breyer (to the extent they joined Justice O'Connor's concurrence) viewed the majority opinion as having rejected a *facial* challenge. The majority opinion, moreover, agreed that its holding "would not 'foreclose the possibility that an individual plaintiff seeking to hasten her death, or a doctor whose assistance was sought, could prevail in a more

particularized challenge[.]' " *Id.* at 735 n.24 (quoting *id.* at 750 (Stevens, J., concurring)).[12]

{94} I need not discuss *Glucksberg* in exegetical detail. Given that *Lawrence* and *Obergefell* emphatically rejected an analysis of unenumerated due process liberty interests upon which *Glucksberg*, like *Bowers*, relied (an analysis focusing solely on the historical roots of the asserted right) and just as emphatically embraced analytical principles that *Glucksberg* rejected (the liberty rights analysis of *Casey* and other decisions addressing due process liberty interests), it is impossible to conclude that the due process analysis applied in *Glucksberg* is dispositive of the issue today, even as a matter of federal law.

{95} The assumption that a fundamental right exists only if there is a history and tradition of protecting it, shared by *Bowers* and *Glucksberg*, does not comport with the Supreme Court's analysis of due process liberty rights in decisions issued before and afterward. As one noted constitutional scholar has pointed out, "laws prohibiting interracial marriage were far more 'deeply rooted in this Nation's history and

---

[12]As Laurence Tribe has observed, "*Quill*, like *Glucksberg*, splintered the Court in a way that required the majority opinion to acknowledge that the Court's holding left open 'the possibility that some applications of the state statute may impose an intolerable intrusion on the patient's freedom.' " Laurence H. Tribe, *Lawrence v. Texas: The "Fundamental Right" That Dare Not Speak Its Name*, 117 Harv. L. Rev. 1893, 1918 n.89 (2004) (quoting *Quill*, 521 U.S. at 809 n.13) (alteration omitted).

tradition' than the right to interracial marriage, but in *Loving v. Virginia*, the Court held that such a right is protected by the Due Process Clause. And there was no deeply rooted tradition of protecting a right to abortion before *Roe v. Wade*. In fact, abortion was illegal in forty-six states when *Roe* was decided." Erwin Chemerinsky, *Washington v. Glucksberg Was Tragically Wrong*, 106 Mich. L. Rev. 1501, 1505 (2008) (footnotes omitted). Furthermore, "the fact that laws have long existed does not answer the question as to whether the interest the laws regulate is so integral to personhood as to be worthy of being deemed a fundamental right." *Id.*

{96}    The opinion of the Court in *Obergefell* briefly addressed *Glucksberg*, in rejecting respondents' argument that petitioners' assertion of "a new and nonexistent" right was inappropriate in light of *Glucksberg. See Obergefell*, ___ U.S. at ___, 135 S. Ct. at 2602. The Court said that, although *Glucksberg*'s requirement that liberty "must be defined in a most circumscribed manner, with central reference to specific historical practices . . . may have been appropriate for the asserted right there involved (physician-assisted suicide), it is inconsistent with the approach this Court has used in discussing other fundamental rights[.]" *Id.* The majority and concurring opinions in this case seize on this statement as supporting their contention that *Glucksberg*'s analysis still applies to aid in dying. *See* Majority Op. ¶ 35; Concurring

95

Op. ¶ 58. Stating that "[i]n *Obergefell*, every member of the United States Supreme Court . . . passed upon an opportunity to question the majority's reference to the outcome in *Glucksberg* or cast aspersion upon the analysis of aid in dying that was utilized in *Glucksberg*[,]" the majority opinion represents *Obergefell* as providing "a specific reference of approval and a brief defense of *Glucksberg*." Majority Op. ¶ 35; *see also* Concurring Op. ¶ 58. This characterization of *Obergefell* as an endorsement of *Glucksberg* is specious. It ignores that there was no occasion for the *Obergefell* Justices to question or disparage *Glucksberg*'s analysis of aid in dying, as the issue was not before the Court. And it is exceedingly difficult to imagine how *Obergefell* could be so understood given what the Court said next: "If rights were defined by who exercised them in the past," the Court explained, "then received practices could serve as their own continued justification and new groups could not invoke rights once denied." *Obergefell*, ___ U.S. at ___, 135 S. Ct. at 2602. "[R]ights come not from ancient sources alone. They rise, too, from a better informed understanding of how constitutional imperatives define a liberty that remains urgent in our own era." *Id.* This view of substantive due process rights could not be more contrary to *Glucksberg*, and the application of this principle cannot be understood to be limited to the identity of the right at issue.

{97}    If the *Obergefell* Court had applied a *Glucksberg* analysis, it could not have identified a history and tradition protecting the right to marry another of the same sex, just as it could not identify a history and tradition protecting the right to engage in same-sex sodomy when it applied that restrictive analysis in *Bowers*. I can think of no principled reason why there should be two tests for substantive due process rights; one for aid in dying, and one for everything else. Although the opinion of the Court in *Obergefell* left *Glucksberg* untouched (again it had no reason to reach out to overrule it), the dissent correctly acknowledged that the majority's position "require[d] it to effectively overrule *Glucksberg*." *Obergefell*, ___ U.S. at ___, 135 S. Ct. at 2621 (Roberts, J., dissenting). It remains to be seen, of course, what the outcome would be if the Court were to address aid in dying again, but the conclusion is inescapable that the United States Supreme Court itself has disclaimed the substantive due process analysis upon which *Glucksberg*'s holding rests.

{98}    Reams of critical analysis by numerous commentators, preeminent constitutional scholars among them, also belie the State's conclusory contention that *Glucksberg* is not "flawed," and so should be followed under our interstitial approach to analysis of rights afforded by provisions of our Constitution that have federal analogues (more on that later). *See, e.g.*, Chemerinsky, *supra*, at 1506 ("The

97

methodology of *Lawrence* . . . cannot be reconciled with Chief Justice Rehnquist's restrictive view of rights under the Due Process Clause [in *Glucksberg*]."); Yale Kamisar, *Foreword: Can Glucksberg Survive Lawrence? Another Look at the End of Life & Personal Autonomy*, 106 Mich. L. Rev. 1453, 1455-56 (2008) (noting commentary that, although the *Lawrence* majority did not cite *Glucksberg*, "the aspersions *Lawrence* cast on *Bowers* inevitably fell with equal force on *Glucksberg*—especially the narrow view of substantive due process *Glucksberg* shared with *Bowers*" (footnote, internal quotation marks, and citation omitted)); Tribe, *supra*, at 1923 (stating that *Lawrence* demonstrates that "[n]othing in *Glucksberg* can fairly be understood to have cemented the *Bowers* transmutation into our constitutional law").

{99}    Commentators have noted, for example, the majority's recharacterization of the right asserted by the plaintiffs. *See, e.g.*, Ruth C. Stern & J. Herbie Difonzo, *Stopping for Death: Re-Framing Our Perspective on the End of Life*, 20 U. Fla. J.L. & Pub. Pol'y 387, 418 (2009) ("In neither the majority nor in the five concurring opinions did the justices correctly or coherently define the questions presented."). Even scholars who have questioned whether *Lawrence* necessarily means that the United States Supreme Court will recognize a right to aid in dying have described *Glucksberg*'s

98

"fragility" in light of the obvious lack of agreement among the justices, even as to the precise question answered. *See* Kamisar, *supra*, at 1459-60 (noting, *inter alia*, that Justice O'Connor really did not join the majority; that the five concurring opinions "make for frustrating reading and a shaky ruling"; and that *Glucksberg* "may be the most confusing and the most fragile 9-0 decision in Supreme Court history"). As Kamisar has observed, "although Rehnquist's opinion is called 'the opinion of the Court,' it does not seem to deserve that designation." Kamisar, *supra*, at 1462. For example, "[a]lthough formally Justice O'Connor provided the much-needed fifth vote, it is highly doubtful that she really did[,]" *id.* at 1462, and Justice Stevens' concurring opinion "is primarily a dissent." *Id.* at 1464.

{100}    The State does not address the fractured nature of *Glucksberg*'s concurring opinions. Indeed, counsel for the State said at oral argument that he was not "properly equipped to discuss . . . some of the nuanced views" stated in those opinions. And, although *Obergefell* was not decided until after oral argument, *Lawrence* had been decided, yet the State did not acknowledge that *Lawrence* unequivocally rejected the rigid historical analysis upon which *Bowers* and *Glucksberg* relied exclusively, and instead embraced a concept of liberty that protects "an autonomy of self," which *Glucksberg* disavowed.

{101} The majority and concurring opinions in this case also say nothing about the impact of *Glucksberg*'s fractures and fragility on its authoritative value; like the State, they essentially say that we should give the decision dispositive effect because it exists and has not been overruled. *See* Majority Op. ¶ 34; Concurring Op. ¶ 58. These opinions also do not address the critical commentary, offering only that "[t]he fact that *Glucksberg*'s analytic methodology has been questioned by some legal scholars does not mean the opposite of its holding must be true." Majority Op. ¶ 34.

{102} But even accepting the State's conclusory assertion that *Glucksberg* is not "flawed," neither the State nor the majority or concurring opinions offer any reason why it should be treated as persuasive, given the United States Supreme Court's current analysis of due process liberty interests and over seventeen years of experience (and evidence) with aid in dying, which the *Glucksberg* Court did not have before it. Whatever the status of *Glucksberg* in the federal courts, the bottom line is that it does not bind us here, and our analysis of rights afforded by the New Mexico Constitution—the only source of rights invoked by Plaintiffs—is not "inextricably tied" to it. *See, e.g.*, *N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-005, ¶ 37, 126 N.M. 788, 975 P.2d 841; *State v. Gutierrez*, 1993-NMSC-062, ¶ 16, 50-56, 116 N.M. 431, 863 P.2d 1052.

## C. Article II, Section 18 and Our Interstitial Approach

{103} Our Supreme Court has previously interpreted the New Mexico due process clause more expansively than the United States Supreme Court has interpreted the federal due process clause, holding in *Montoya v. Ulibarri*, 2007-NMSC-035, ¶ 23, 142 N.M. 89, 163 P.3d 476, that New Mexico's due process clause requires that habeas petitioners must be permitted to assert freestanding claims of actual innocence. *See also State v. Vallejos*, 1997-NMSC-040, ¶ 32, 123 N.M. 739, 945 P.2d 957 (holding that all forms of entrapment violate New Mexico's due process clause; rejecting widely criticized U.S. Supreme Court precedent to the contrary as to the federal counterpart).[13] And nothing in our Supreme Court's most recent interpretation of Article II, Section 18 remotely suggests that analysis of liberty interests under New

---

[13]Our Supreme Court has rejected federal constitutional precedent and analysis affording less protection than our own Constitution under other provisions as well. *See, e.g.*, *State v. Leyva*, 2011-NMSC-009, ¶ 51, 149 N.M. 435, 250 P.3d 861 (departing from Fourth Amendment analysis when construing analogous Article II, Section 10); *State v. Garcia*, 2009-NMSC-046, ¶ 34, 147 N.M. 134, 217 P.3d 1032 (rejecting widely criticized United States Supreme Court decision weakening a right "beyond a point which may be countenanced under our state constitution"); *State v. Rowell*, 2008-NMSC-041, ¶¶ 20-23, 144 N.M. 371, 188 P.3d 95 (declining to follow United States Supreme Court decisions criticized in legal literature as "devoid of a reasoned basis in constitutional doctrine"); *Gutierrez*, 1993-NMSC-062, ¶¶ 32, 50-56 (discussing "a willingness to undertake independent analysis of our state constitutional guarantees when federal law begins to encroach on the sanctity of those guarantees" and rejecting federal constitutional rule as incompatible with the guarantees of the New Mexico Constitution).

Mexico's due process clause requires the rigid adherence to historical analysis that *Glucksberg*, like *Bowers*, elevated to the exclusion of all else. *See Griego*, 2014-NMSC-003, ¶ 2 ("Interracial marriages were once prohibited by laws in many states until the United States Supreme Court declared such laws unconstitutional and ordered an end to the discriminatory treatment."); *id.* ¶ 58 ("Articulating the governmental interest as maintaining the tradition of excluding same-gender marriages because the historic and cultural understanding of marriage has been between a man and a woman—cannot in itself provide a sufficient basis for the challenged exclusion. To say that the discrimination is traditional is to say only that the discrimination has existed for a long time." (alteration, internal quotation marks, and citation omitted)). Indeed, *Griego* acknowledged both *Lawrence*, *see Griego*, 2014-NMSC-003, ¶ 58, and the privacy right recognized in *Eisenstadt*, 405 U.S. at 453, *see Griego*, 2014-NMSC-003, ¶ 60 n.10.

{104}     Thus, to the extent it is appropriate to be guided by federal law in determining whether New Mexico's due process clause protects aid in dying, the sound and persuasive analysis is that which embraces the view of liberty, autonomy, and privacy elucidated in the *Casey*/*Lawrence*/*Obergefell* line of cases and rejects the analysis of *Bowers* and *Glucksberg*. Even if *Glucksberg* remains good law, as a matter of

federaldue process analysis, I would reject it as unpersuasive, flawed, and inadequate to protect the rights of New Mexicans. *Garcia*, 2009-NMSC-046, ¶ 57 (Bosson, J., specially concurring) ("In a government of dual sovereigns, it is imperative that our state Constitution develop to its full potential and protect the rights of our citizens where we deem federal law lacking."). The State has conceded that citizens have a fundamental right to make their own end-of-life decisions and stated at oral argument before this Court that citizens have a fundamental right to bring about their own deaths, even by stockpiling morphine prescribed by a physician and ingesting a lethal dosage. The State further conceded at oral argument that it had no interest in preventing suffering, mentally competent, terminally ill patients from obtaining aid in dying. *See* Oral Argument, No. 33,360 at 4:19:15-4:19:30 (Jan. 26, 2015) ("The State interest does not lie in prolonging the suffering of people who are in fact terminally ill, and have made an informed, competent decision to request this sort of medication. *I will readily concede that the State has no interest in preventing that person from obtaining this sort of assistance.*" (emphasis added)); *supra*, at 4:18:40-4:19:00 ("I don't think there would be a compelling state interest in preventing a person at the very end of their life who is, in fact, terminally ill and mentally competent from obtaining this sort of assistance. I don't think the statute would

103

survive strict scrutiny analysis. I don't think the statute would survive an intermediate scrutiny analysis, either, for largely the same reasons."). According to the State, the only conduct proscribed by Section 30-2-4 in this context is a physician's act of prescribing a lethal dosage of medication. Yet it provides no reason, other than its citation to *Glucksberg*, why that conceded fundamental right does not include the only means available to effectuate the right in a peaceful and dignified manner—a lethal dosage of medication prescribed by a willing physician acting in accordance with the established standard of care for aid in dying.[14] Nor does

---

[14]As Justice Souter reasoned in *Glucksberg*:

There is . . . [another] reason for claiming that a physician's assistance here would fall within the accepted tradition of medical care in our society, and the abortion cases are only the most obvious illustration . . . . While the Court has held that the performance of abortion procedures can be restricted to physicians, the Court's opinion in *Roe* recognized the doctors' role in yet another way. For, in the course of holding that the decision to perform an abortion called for a physician's assistance, the Court recognized that the good physician is not just a mechanic of the human body whose services have no bearing on a person's moral choices, but one who does more than treat symptoms, one who ministers to the patient. This idea of the physician as serving the whole person is a source of the high value traditionally placed on the medical relationship. Its value is surely as apparent here as in the abortion cases, for just as the decision about abortion is not directed to correcting some pathology, so the decision in which a dying patient seeks help is not so limited. The patients here sought not only an end to pain (which they might have had, although perhaps at the price of stupor) but an end to their short remaining lives with a dignity that they believed would be denied them by powerful pain medication, as well as

104

it explain or even attempt to justify why a physician's affirmative acts of administering terminal sedation and removing life-sustaining nutrition, hydration, or mechanical life support—undertaken with knowledge that these acts will hasten death—should be legal, while a physician's affirmative act of writing a prescription that will bring about the same result should be criminalized.[15] I would hold that Article II, Section 18 affords New Mexico citizens a fundamental, or at least important, liberty right to aid in dying from a willing physician.

{105}   The majority opinion asserts that "[i]n order to justify a departure from *Glucksberg*, Plaintiffs must have shown precisely why greater fundamental due

> by their consciousness of dependency and helplessness as they approached death. In that period when the end is imminent, they said, the decision to end life is closest to decisions that are generally accepted as proper instances of exercising autonomy over one's own body, instances recognized under the Constitution and the State's own law, instances in which the help of physicians is accepted as falling within the traditional norm.

*Glucksberg*, 521 U.S. at 779 (citations omitted).

[15]*See* Chemerinsky, *supra*, at 1508 ("Turning off a respirator, removing a feeding tube, stopping medication that keeps a person's blood pressure at a level to sustain life; all are affirmative acts. Both are intended to end a person's life—and both will have that effect. The [*Glucksberg*] argument invokes a familiar distinction between omission and commission, but this distinction is inapposite here because ending treatment and administering substances to end life are both acts of commission with the same purpose and effect.").

process protections exist under Article II, Section 4." Majority Op. ¶ 34. It asserts that "we should continue to be very careful when considering new constitutional interests and remain reluctant to deviate from United States Supreme Court determinations of what are, and what are not, fundamental constitutional rights." *Id.* ¶ 35. It assigns Plaintiffs the burden to cite authority for the proposition that " 'death' or 'aid in dying' in New Mexico have either been recognized as embedded principles within our democratic society or as a modern interpretation of certain fundamental interests that have been applied to some members of society but historically denied to others." *Id.* ¶ 36. No authority is cited for any of these propositions. I am aware of none. These and other statements in the majority and concurring opinions reflect a profound misunderstanding of our interstitial approach to state constitutional analysis.

{106}    For example, the majority opinion asserts that "there is no basis under the *Gomez* factors to permit the creation of an interstitial constitutional right under Article II, Section 4 of the New Mexico Constitution." Majority Op. ¶ 43. But we use interstitial analysis to determine whether we should follow federal precedent in interpreting provisions of our Constitution that have federal analogues. *See, e.g.*, *Gomez*, 1997-NMSC-006, ¶¶ 16, 21-23. Section 18's due process clause has a federal counterpart; Section 4 does not. I agree with the district court that Section 4 is a

106

distinctive characteristic of our Constitution that provides a basis to depart from federal precedent in determining the due process rights protected by Section 18. *See NARAL*, 1999-NMSC-005, ¶¶ 28-43 (concluding that distinctive characteristics of the New Mexico Constitution—the Equal Rights Amendment—required rejection of federal equal protection analysis affording less protection). I reject any suggestion that our interstitial analysis requires that we must give federal due process precedents dispositive effect in determining the inherent rights afforded by Section 4.

{107} I also reject the concurring opinion's characterization of our interstitial approach as "narrow" and as permitting departure from federal precedent based only on a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics. *See* Concurring Op. ¶ 58. These grounds were stated in *Gomez*, of course, 1997-NMSC-006, ¶ 19, and have been frequently cited since then. But our Supreme Court has subsequently described these grounds as merely examples of reasons warranting departure from federal precedent. *See Leyva*, 2011-NMSC-009, ¶ 40 n.6 (describing these three grounds as "examples of reason for departure"); *id.* ¶ 49.

{108} The majority opinion appears to confuse the requirements for preserving a claim predicated on a provision of our Constitution that has a federal counterpart with

the parameters that inform our decision whether to follow federal precedent in determining whether the state constitutional provision protects the right asserted. *See* Majority Op. ¶¶ 23, 34. There is no preservation issue here. Plaintiffs have not brought a claim under the federal Constitution. They have identified the provisions of our Constitution that they believe protect the right they assert. They have explained why they believe that each provision protects the right. They have stated reasons why we should not follow *Glucksberg* and why they believe that our Constitution provides broader protection than the federal Constitution. Our interstitial approach requires no more; in fact, it requires less. *See Leyva*, 2011-NMSC-009, ¶ 49 (noting that citation to the state constitutional provision invoked is sufficient).

{109} Our interstitial approach does not require (or even permit) us to treat *Glucksberg* as dispositive of this case simply because it exists. *See Gomez*, 1997-NMSC-006, ¶ 17; *see also Arizona v. Evans*, 514 U.S. 1, 8 (1995) ("[S]tate courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution."). It obligates us to consider whether the federal analysis articulated in *Glucksberg* is persuasive because its underlying reasoning "is better calibrated to protect the rights

108

of individuals" in this state from unwarranted government intrusion. *Leyva*, 2011-NMSC-009, ¶ 53. It is not.

**D.    Article II, Section 4 of the New Mexico Constitution**

{110}    Plaintiffs also assert a right to aid in dying under the New Mexico Constitution's inherent rights guarantee, which provides, "All persons are born equally free, and have certain natural, inherent and inalienable rights, among which are the rights of enjoying and defending life and liberty, of acquiring, possessing and protecting property, and of seeking and obtaining safety and happiness." N.M. Const. art. II, § 4. Section 4 has been sparsely interpreted. *See Reed v. State ex rel. Ortiz*, 1997-NMSC-055, ¶ 105, 124 N.M. 129, 947 P.2d 86 (recognizing that "[o]ur courts have not fully defined the scope of this constitutional provision"), *rev'd sub nom. on other grounds by New Mexico ex rel. Ortiz v. Reed*, 524 U.S. 151 (1998). But that surely does not mean that its text may simply be read out of the Constitution. *See Hannett v. Jones*, 1986-NMSC-047, ¶ 13, 104 N.M. 392, 722 P.2d 643 (noting that the Constitution must be "construed so that no part is rendered surplusage or superfluous"); *cf. Johnson v. Craft*, 87 So. 375, 386 (Ala. 1921) ("The Constitution contains no idle assertions, no meaningless language, [and] no ephemeral purpose[.]").

{111} Nor does it mean that its scope is defined by and limited to the circumstances in which it has previously been invoked, as the State appears to suggest. The State cites *Lucero v. Salazar*, 1994-NMCA-066, ¶ 7, 117 N.M. 803, 877 P.2d 1106, for the proposition that "mere references to the right to enjoy life and to seek and obtain safety and happiness are not sufficient to serve as a basis for a waiver of immunity under [the New Mexico Tort Claims Act]." *Lucero* relied on *Blea v. City of Espanola*, 1994-NMCA-008, ¶ 20, 117 N.M. 217, 870 P.2d 755, which stated that "vague references to safety or happiness in [A]rticle II, Section 4 . . . are not sufficient to state a claim under [the New Mexico Tort Claims Act]." *Blea* made clear, however, that the issue in that case was "not what our [C]onstitution protects or does not protect[,]" but "the scope of the acts for which the [L]egislature has waived immunity." *Id.* These cases have no bearing on the question presented here, which quite obviously requires us to determine what our Constitution protects in this context.

{112} Equally clear is that this case involves a great deal more than a vague reference to "safety and happiness." Far more significant, and relevant here, is that the framers of our Constitution saw fit to include in their enumeration of rights guaranteed as "inherent" the right—and agency to effectuate the right—to "enjoy[] and defend[]"

110

their own "li[ves] and liberty" against unjustified intrusions by the government. N.M. Const. art. II, § 4. Section 4 is no mere "ornament," as one amicus declares. To the contrary, *Griego* begins by quoting its text in full, emphasizing the primacy of the inherent rights provision in any consideration of the liberty rights of our citizens. *See* 2014-NMSC-003, ¶ 1. And *Griego* instructs that "[w]hen government is alleged to have threatened any of these rights, it is the responsibility of the courts to interpret and apply the protections of the Constitution." *Id.*

{113} I think it is plain that Section 4 supplements and expands the liberty rights afforded by Section 18's due process clause to ensure maximum protection for the lives and liberty of New Mexicans. The express textual rights to "enjoy[] and defend[]" these interests can mean nothing less. I would hold that, whether construed on its own terms as a constitutional provision with no federal analogue, or deemed a "distinctive characteristic" of the New Mexico Constitution mandating rejection of a federal constitutional analysis affording less protection, *see, e.g.*, *NARAL*, 1999-NMSC-005, ¶¶ 28-43, Section 4 affords New Mexico citizens the right and agency to defend their lives and liberty by availing themselves of aid in dying, as that term is defined herein.

111

{114} Relying on a dictionary definition of "life," the majority opinion recasts the liberty interest asserted by Plaintiffs as "an implied fundamental interest in hastening another person's death" and then declines to recognize it "because such an interest is diametrically opposed to . . . life." Majority Op. ¶ 39 (alteration, internal quotation marks, and citation omitted); *see also* Concurring Op. ¶ 59. Despite the contrary stipulated record, the opinion seems to equate the dying and suffering patient who seeks aid in dying with a person who wishes to commit suicide, and her doctor with any miscreant who counsels another to commit suicide against her will. *See* Majority Op. ¶ 40 (citing, *inter alia*, *Commonwealth v. Bowen*, 13 Mass. 356 (1816)). This re-characterization ignores the distinctions between suicide and aid in dying established by the trial testimony and reflects a shocking disrespect for the individuals whose circumstances would bring them to seek aid in dying, individuals who would live if they could, but whose terminal illnesses will not allow them to do so. For these individuals, "death" is imminent, and "life" means being forced to endure unbearable suffering until it ends. The majority's characterization of aid in dying as contrary to the interest in "life" protected by the inherent rights guarantee, *see also* Concurring Op. ¶ 59, also misapprehends the nature of the liberty interest asserted by Plaintiffs, and ignores that Article II, Section 4 protects the right to "liberty" as well as to life,

112

and the right to defend that liberty against unjustified government intrusion. Having declared what amounts to lock-step adherence to federal due process precedent, the majority and concurring judges ought to consider that under federal law, "a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims." *Casey*, 505 U.S. at 857 (citing, *inter alia*, *Cruzan*, 497 U.S. at 278). They should also consider the record in this case, which establishes that the State has articulated no basis, and concedes none exists, for intruding into the liberty interests of mentally competent, terminally ill New Mexicans to seek aid in dying, as discussed further below.

## III.    THE ASSERTED STATE INTERESTS

{115}    The determination that our Constitution affords New Mexicans a right to aid in dying does not end the matter. The next question is whether the State has carried its burden to prove that Section 30-2-4's infringement of that right is constitutionally justified. *See Wagner v. AGW Consultants*, 2005-NMSC-016, ¶ 12, 137 N.M. 734, 114 P.3d 1050. We apply strict scrutiny when the interest at issue is a "fundamental personal right or civil liberty" guaranteed by the Constitution. *Marrujo v. N.M. State Highway Transp. Dep't*, 1994-NMSC-116, ¶ 10, 118 N.M. 753, 887 P.2d 747. Strict scrutiny requires the government to prove that the infringing statute is narrowly

113

tailored to serve a compelling governmental interest. *Id.* ¶¶ 10-11. Intermediate scrutiny, which applies when legislation infringes on important but not fundamental rights, requires the government to prove that the infringing statute is substantially related to an important governmental interest. *Id.* Relying on *Glucksberg*, the State presumes, as does the concurring opinion, that the less stringent rational basis standard applies here. That standard requires the party asserting the right to show that the statute is not rationally related to a legitimate governmental interest. *See Marrujo*, 1994-NMSC-116, ¶¶ 10-12 (describing the three levels of scrutiny applicable to review of equal protection and substantive due process claims). On this record, I would conclude that Section 30-2-4, as applied to aid in dying, does not survive scrutiny under any standard.

{116}    Throughout this litigation, the State has relied exclusively on the governmental interests asserted by the State of Washington in *Glucksberg*: (1) preserving life; (2) "protecting the integrity and ethics of the medical profession"; (3) "ensuring adequate regulation of the practice"; and, for the first time on appeal, (4) preventing suicide and treating its causes. Beyond simply reciting these interests, the State has made virtually no effort to explain how any of them justify applying Section 30-2-4 to aid

in dying in New Mexico.[16] As noted, the State stipulated to the entirety of the evidence presented in the district court. It did not challenge any of the evidence as flawed or unsupported, nor did it call any witnesses or provide any evidence of its own. The State further conceded at oral argument that other than an interest in preventing the "hypothetical potential for abuse," it had no interest—compelling or substantial or otherwise—in preventing suffering, mentally competent, terminally ill patients from obtaining aid in dying. Nor could it cite a single instance of abuse in any United States jurisdiction where aid in dying is legal—including in Montana, which has no legislatively enacted regulatory framework and is governed entirely by the medical profession's standard of care. The State merely incants *Glucksberg*, as if it held talismanic significance. But the State may not claim substantial or compelling interests without providing *any* such evidence; on that basis alone, Section 30-2-4's

[16]Like the State, the majority and concurring opinions rely only on the broadly stated governmental interests set forth in *Glucksberg*, and like the State, they provide no analysis explaining how those interests justify denying the right to aid in dying. *See* Majority Op. ¶ 37; Concurring Op. ¶ 61. Nor do the opinions reconcile their position with the State's stipulation to the entire factual record and the State's concession that it has no interest in "prolonging the suffering of people who are terminally ill." To the extent that the majority and concurring opinions discuss aid in dying as "a matter of relatively recent human phenomena," Majority Op. ¶ 37; Concurring Op. ¶ 62, it is unclear why this itself poses an obstacle. If the concern is lack of information, there is now almost twenty years of data that the *Glucksberg* Court did not have.

115

prohibition on aid in dying fails under heightened scrutiny. *See Griego*, 2014-NMSC-003, ¶ 57 ("[T]he party with the burden of proof in a constitutional challenge must support his or her argument with a 'firm legal rationale' or evidence in the record."). And even under the rational basis standard, the State must do more than cite to interests asserted by another state more than seventeen years ago—at least in this case, in which it has stipulated to a record that demonstrates that the concerns raised in *Glucksberg* have not materialized in states that allow aid in dying. Below, I address the State's broadly asserted interests, as well as those raised by amici for the State, in light of Plaintiffs' uncontradicted evidence and the State's concessions.

**A.    Interests in Life and Preventing Suicide**

{117}    No one doubts, as a general abstract matter, that the government has a compelling interest in preserving human life. The specific question presented in this case, however, is whether the State has a compelling—or substantial—interest in prolonging the lives of mentally competent, terminally ill patients, the quality of whose lives can no longer be meaningfully improved by treatment, and whose dying process is so intolerable that they wish to end their lives. The State is unable to articulate an interest in prolonging life in this narrow circumstance and concedes that it has no interest in preventing the terminally ill from hastening their deaths and

116

avoiding painful, undignified, and inhumane endings to their lives. And the State does not dispute that when a patient is close to the end of life and suffering intractable, unrelenting pain, it is legal and ethical for her physician to sedate her and maintain her in a state of deep, continuous unconsciousness to the time of death, with or without providing artificial hydration or nutrition, thereby hastening death.

{118} Nor does the law treat the safeguarding of human life as a governmental interest that is absolute, subject to no exceptions. For example, under current New Mexico law and United States Supreme Court precedent, *any* patient may refuse or withdraw life-sustaining treatment, may voluntarily stop eating and drinking, and may obtain from a qualified physician medication that will deeply sedate her—and thereby hasten death—to alleviate suffering. *See generally* §§ 24-7A-1 to -18 (expanding the right to withdraw or withhold life-sustaining treatment to *all* medical decisions and *all* patients); *Glucksberg*, 521 U.S. at 736-37 (O'Connor, J., concurring) ("[A] patient who is suffering from a terminal illness and who is experiencing great pain has no legal barriers to obtaining medication, from qualified physicians, to alleviate that suffering, even to the point of causing unconsciousness and hastening death."); *Cruzan*, 497 U.S. at 279 (assuming a constitutionally protected right for those who are on life support to have it ended). Thus, some decisions to end one's life

117

intentionally through termination or refusal of treatment are clearly regarded as worthy of protection, and this is so even where the assistance of a physician is required. These settled constitutional and statutory rights *necessarily* acknowledge a diminished governmental interest in the protection of life under certain circumstances.[17] *See Compassion in Dying v. Washington*, 79 F.3d 790, 820 (9th Cir. 1996) (en banc) ("When patients are no longer able to pursue liberty or happiness and do not wish to pursue life, the state's interest in forcing them to remain alive is clearly less compelling."), *rev'd on other grounds by Glucksberg*, 521 U.S. at 709. I would hold that the State's mere assertion of a general interest in the preservation of life cannot outweigh the constitutionally protected liberty interest of a mentally competent, terminally ill patient to aid in dying. *See Casey*, 505 U.S. at 857 ("[A] State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims." (citing *inter alia Cruzan*, 497 U.S. at 278)).

{119}  The State's asserted interest in "preventing suicide and treating its causes," raised for the first time on appeal, is unquestionably significant but irrelevant in this

---

[17]The United States Supreme Court has identified similarly shifting state interests at the other end of the spectrum of life. *See Roe*, 410 U.S. at 155; *Casey* 505 U.S. at 860, 869-73 (affirming the central holding of *Roe*). Thus, as the government's interest in life increases during the course of a pregnancy, *see Casey*, 505 U.S. at 869-73, so it diminishes when a suffering patient faces near and imminent death.

118

case. Unrebutted expert testimony at trial established that the practice of aid in dying bears almost no medical or psychological overlap with suicide, as the two phenomena are fundamentally distinct mental and physical processes. Patients who request aid in dying do so because they are suffering from a terminal and incurable physical condition, rather than from a temporary, treatable mental pathology, as is typical of suicide. In addition, the collaboration between a physician and terminally ill patient over time reflects a deliberative, rational process intended to preserve the patient's sense of self and coherent self-image; the antithesis of the impulse-driven, self-destructive behavior of the mentally unstable person who commits suicide. *See, e.g.*, Roy F. Baumeister, *Suicide as Escape from Self*, Psychological Review, Vol. 97, No. 1 at 90 (1990). Unlike the suicidal person whose psychiatric disorder is amenable to treatment, the terminally ill patient wants to live but cannot because incurable disease makes near-term death inescapable. The State itself admits that individuals seeking aid in dying "are patients who, if the option were available to them, would continue to live a full and rewarding life." Furthermore, the families of terminally ill patients requesting aid in dying tend to be more prepared for, and at peace with, the deaths of their loved ones, and they are often gathered to say farewell; this is in contrast to the

feelings of shock, blame, guilt, anger, and/or shame that often accompany death by suicide.

{120} This unchallenged expert testimony is supported by amici New Mexico Psychological Association and the American Medical Women's Association, American Medical Students Association, and New Mexico Public Health Association, who agree that the reasoning on which a mentally competent, terminally ill person bases a decision to end his or her life is distinct from the reasoning a clinically depressed person uses to justify suicide. As Justice James C. Nelson eloquently summarized in *Baxter v. Montana*,

> "Suicide" is a pejorative term in our society. . . . The term denigrates the complex individual circumstances that drive persons generally—and, in particular, those who are incurably ill and face prolonged illness and agonizing death—to [seek aid in dying]. The term is used to generate antipathy, and it does. [The patients seeking aid in dying] do not seek to commit "suicide." Rather, they acknowledge that death within a relatively short time is inescapable because of their illness or disease. And with that fact in mind, they seek the ability to self-administer, at a time and place of their choosing, a physician-prescribed medication that will assist them in preserving their own human dignity during the inevitable process of dying. Having come to grips with the inexorability of their death, they simply ask the government not to force them to suffer and die in an agonizing, degrading, humiliating, and undignified manner. They seek nothing more nor less[.]

2009 MT 449, ¶ 71, 354 Mont. 234, 224 P.3d 1211 (Nelson, J., specially concurring).

{121} I conclude that, although the State's interests in preserving life and preventing suicide may be compelling or substantial in the abstract, these broadly stated general interests are insufficient to justify infringing the right to aid in dying. Given the State's stipulations and concessions in this case, there is no basis for a contrary conclusion.

**B.      The Integrity of the Medical Profession and Adequate Regulation**

{122} The State makes three arguments concerning its interest in the integrity of the medical profession and the necessity for regulations: (1) *Glucksberg* recognized the interest; (2) there are no preexisting legislative definitions of "mentally competent" and "terminally ill"; and (3) there is no regulation of the manner in which a patient makes the request. The stipulated factual record undercuts these arguments, and the State's unsupported conclusions are insufficient to justify Section 30-2-4's prohibition against aid in dying.

{123} The State's reliance on *Glucksberg*'s stated concerns about protecting the integrity and ethics of the medical profession is unavailing. First, to the extent that the *Glucksberg* Court generally accepted that "the American Medical Association, like many other medical and physicians' groups, has concluded that physician-assisted suicide is fundamentally incompatible with the physician's role as healer[,]"

121

521 U.S. at 731 (alteration, internal quotation marks, and citation omitted), that view began to shift significantly within the medical community soon after *Glucksberg* was decided. In fact, by 2005, two national surveys revealed that a majority of polled rank-and-file physicians believed it to be ethical for a doctor to assist a competent, dying patient hasten death.[18] Two months ago, the California Medical Association, representing more than 40,000 physicians in that state, removed its historic opposition to a bill that would allow doctors to prescribe lethal doses of medication to terminally ill patients. California Medical Association Removes Opposition to Physician Aid in Dying Bill (May 20, 2015), *available at* http://www.cmanet.org/news/press-detail/?article=california-medical-association-removes. Regardless, a ruling holding that the New Mexico Constitution protects the right to aid in dying would not compel any physician to provide aid in dying.

---

[18]*See* The Jewish Theological Seminary, *Physician-Assisted Suicide Survey*, *available at* http://www.jtsa.edu/x5533.xml (finding that 57% of 1,088 physicians polled believed aid in dying ethical); *News & Innovations*, 20 J. Pain and Palliative Care Pharmacotherapy 83, 92 (2006) (finding that a majority of 677 physicians and 1,057 members of the public polled believed that physicians should be permitted to practice aid in dying). Most recently, in a survey of 17,000 American physicians representing 28 medical specialties, a majority stated the belief that patients with an "incurable and terminal" disease should have the option to choose aid in dying. Medscape Ethics Report 2014, Part 1: Life, Death, and Pain, at 2 (December 16, 2014), *available at* http://www.medscape.com/features/slideshow/public/ethics2014-part1#1.

{124}   Second, the stipulated record in this case includes evidence of the experience with aid in dying in Oregon, Washington, Montana, and Vermont;[19] uncontroverted opinion evidence of medical ethicists and practitioners informed by the experience in United States jurisdictions with legalized aid in dying; and specific evidence concerning current palliative care and palliative/terminal sedation practices. And this evidence (almost two decades worth) proves that the medical profession has not become corrupted or compromised in any respect in jurisdictions where aid in dying is allowed. *Cf. Casey*, 505 U.S. at 863-64 (explaining that the decisions in *West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937), and *Brown v. Board of Education*, 347 U.S. 483 (1954), "each rested on facts, or an understanding of facts, changed from those which furnished the claimed justifications for the earlier constitutional

---

[19]For example, the Oregon Health Authority recently produced its 2014 annual "Death with Dignity Act - 2014" report, which identifies the number of prescriptions written, number of deaths, patient characteristics, physician characteristics, type of medications, complications, data analysis, and end-of-life concerns, along with historical, legal and statutory challenges, from the time of the law's enactment in1998 through February 2, 2015, and includes supporting documents. Oregon Public Health Division, Oregon's Death With Dignity Act - 2014, *available at* https://public.health.oregon.gov/ProviderPartnerResources/EvaluationResearch/D eathwithDignityAct/Pages/index.aspx. The Washington Department of Health similarly issued its fifth annual report containing much of the same information. Washington State Department of Health 2013 Death With Dignity Act Report, Executive Summary, *available at* http://www.doh.wa.gov/portals/1/Documents/Pubs/422-109-DeathWithDignityAct 2013.pdf.

123

resolutions[,]" and that "[i]n constitutional adjudication as elsewhere in life, changed circumstances may impose new obligations, and the thoughtful part of the Nation could accept each decision to overrule a prior case as a response to the Court's constitutional duty").

{125} Third, the State ignores the fact that, for all practical purposes, physicians already participate in helping terminal patients to end their lives. Some doctors do this by ending medical care necessary to sustain life. And, as explained above, when doctors terminally sedate patients, they know that they are "hastening that moment at which that death will occur."[20] The State has not cited any example where the integrity and/or ethics of the medical profession have been called into question in jurisdictions in which aid in dying is practiced; the unspecified concern it adverts to here is speculative and bereft of evidentiary support.

{126} The State's asserted interest in adequate regulation rests on the flawed premise that such legislation is required. As a legal matter, the existence of regulations is surely not a prerequisite to the recognition of a constitutional right. As a factual

---

[20]*See also* Roger S. Magnusson, *"Underground Euthanasia" & the Harm Minimization Debate*, 32 J.L. Med. & Ethics 486, 486 (2004) ("A national survey of 1092 American physicians found that 3.3 percent had written at least one 'lethal prescription,' while 4.7 percent had provided at least one lethal injection. A survey of American oncologists found that 3.7 percent had performed euthanasia, while 10.8 percent had [provided aid in dying]." (footnote omitted)).

124

matter, medical care is typically governed by professional standards of practice, not by statutes or court decisions that either prohibit or provide affirmative authorization for specific types of care. *See* 61 Am. Jur. 2d *Physicians, Surgeons, & Other Healers* § 187 (2015); *see also Pharmaseal Labs. Inc. v. Goffe*, 1977-NMSC-071, ¶ 14, 90 N.M. 753, 568 P.2d 589 (discussing a physician's obligation to adhere to recognized standards of medical practice in the community); *Gonzales v. Oregon*, 546 U.S. 243, 271 (2006) (noting that the development of best practices in medicine—also referred to as the standard of care—is left to physicians and regulated by the states).

{127} Dr. Kress, who practices aid in dying in Montana, which has no regulatory framework, testified at length about how doctors in that state would be liable for malpractice were they to prescribe the medication without "tapping into" the existing standard of care for aid in dying that has developed over seventeen years of clinical experience in Oregon. Today, that established standard of care, which the State does not dispute exists and to which physicians in New Mexico would be held, includes the requirements that an eligible patient for aid in dying must be a terminally ill, mentally competent adult who has made repeated requests over multiple visits, and who is able to self-administer the medication. Mental competence means that the patient does not have any gross cognitive or psychological impairment and that she

125

understands the nature of the illness and the proposed treatments, including any alternatives such as hospice care and pain control, and the potential risks and probable results of taking the medication that will result in her death. Thus, for example, a patient with Alzheimer's disease or a brain cancer that affects cognition is not eligible for aid in dying. In addition, the standard of care for providing aid in dying directs, in part, that a patient is terminally ill when she has less than six months to live; that to establish terminality, two physicians must agree to the diagnosis; and that the patient must be able to understand the information presented to her and to make a reasoned decision. I also view as significant the trial testimony about a doctor's relationship with her patient and the often lengthy process of caring for someone who has a terminal illness.

{128}　In addition to civil liability for failing to comply with the standard of care, as Dr. Kress described, all doctors in New Mexico are subject to regulation by the state medical board, which has been tasked by the Legislature with protecting the public from "the improper, unprofessional, incompetent and unlawful practice of medicine," and which supervises the profession by licensing competent physicians and by disciplining those whose performance falls below its requirements. NMSA 1978, § 61-6-1 (2003). Discipline for gross negligence includes the revocation or

suspension of a license to practice medicine in New Mexico. NMSA 1978, § 61-6-15(A), (D)(12) (2008).

{129}   The State's attempt to justify the blanket prohibition of a liberty interest that it concedes is "important and fundamental," solely on the basis that the Legislature has not enacted legislation to ward off dangers that have not before materialized, is without merit. Such an approach would obliterate constitutional recognition and protection of virtually any liberty interest requiring the intervention of the medical profession, including the right found in *Roe*, 410 U.S. at 155, and affirmed in *Casey*, 505 U.S. at 846. Although I conclude that the need for regulation of aid in dying is not necessary given the existing standard-of-care framework, the Legislature is free to enact appropriate guidelines to ensure that only the terminally ill who make a voluntary and informed decision may receive aid in dying. What it may not do is intrude upon the doctor-patient relationship[21] as it relates to the constitutional right to aid in dying by criminalizing the provision of aid in dying by a willing physician at the request of a mentally competent, terminally ill patient.

**C.   Abuse of Vulnerable Populations and Slippery Slope**

---

[21]Here, as in the context of reproductive autonomy, "[w]hatever constitutional status the doctor-patient relation may have as a general matter, in the present context it is derivative of the [patient]'s position" and "is entitled to the same solicitude it receives in other contexts." *Casey*, 505 U.S. at 884.

127

{130} At oral argument, the State acknowledged that preservation of life was "a pretty weak interest" when applied to terminally ill patients but said that the interest in life extended to potential areas of abuse. Although the State admitted that this was a "phantom concern" and that "the sky has not fallen," the State's amici cite interests in protecting vulnerable individuals, including the elderly and disabled, from exploitation and abuse, and in avoiding a slippery slope to "non-voluntary euthanasia."[22]

{131} Abuse of any sort is, of course, a legitimate governmental concern in general, but this "interest" is far too abstract to justify infringement of the constitutional right to aid in dying. First, the detailed protocols and established standard of care—requiring, among other things, the mental competence and informed consent of the patient, ability of the patient to self-administer the medication, a diagnosis of terminal illness by two physicians, and repeated requests with waiting periods in between—undeniably guard against the speculative dangers that amici raise. Moreover, amici fail to explain how the circumscribed right to aid in dying would

---

[22] Non-voluntary euthanasia is defined as causing or hastening the death of "an incompetent, and therefore nonconsenting, person; euthanasia that occurs when the person killed is incapable of either making or refusing to make a request to be killed." *Black's Law Dictionary* (10th ed. 2014). Non-voluntary euthanasia has nothing to do with the practice of aid in dying.

increase the frequency of elder abuse and disproportionately affect the poor and disabled.

{132}   And again, as previously noted, the State and amici have not provided a single example of abuse in any United States jurisdiction where aid in dying is legal. The record contains no such evidence, and almost two decades of substantial data from Oregon and elsewhere are to the contrary. *See* Or. Pub. Health Div., Oregon's Death with Dignity Act Rep. (2014); Wash. State Dept. of Health, 2013 Death with Dignity Act Rep., Exec. Summary (2014). According to the data and evidence described above, issues of coercion, insidious bias, and societal indifference have not occurred and have not threatened the safety of people who are poor, elderly, uninsured, or disabled.[23] *See* Oregon's Death with Dignity Act Rep., *supra*, at 1-6; Wash. State Dept. of Health 2013 Death with Dignity Act Rep., *supra*, at 1-12; *see also* Margaret P. Battin, et al., *Legal Physician-Assisted Dying in Oregon and the Netherlands: Evidence Concerning the Impact on Patients in "Vulnerable" Groups*, 33 J. Med. Ethics 591, at 591 (2007) (finding no evidence of "heightened risk" to patients with

---

[23] Amici's related argument concerning the increase in the number of physician-assisted deaths in the Netherlands and Belgium is inapplicable to the issue before us for a host of reasons including, most notably, the fact that those countries practice euthanasia and do so under an entirely different set of laws and standards. For the same reason, the concurring opinion's citation to a *New Yorker* article concerning euthanasia in Belgium, *see* Concurring Op. ¶ 64 n.9, is also inapt.

129

non-terminal physical disabilities or mental disabilities or other vulnerable groups). Rather, patients who have ingested the medication are overwhelmingly white, married, college-educated, insured, receiving hospice services, and dying of cancer or ALS (commonly referred to as Lou Gehrig's disease). *See* Oregon's Death with Dignity Act Rep., *supra*, at 4-5; Wash. State Dept. of Health 2013 Death with Dignity Act Rep., *supra*, at 1. Nearly all patients pass away at home, and complications are rare, occurring in less than three percent of all cases. *See* Oregon's Death with Dignity Act Rep., *supra*, at 2, 5; Wash. State Dept. of Health 2013 Death with Dignity Act Rep., *supra*, at 1, 9.

{133} Trial experts testified that the potential for mistaken diagnoses are low. Physicians have established referral pathways to learn about safe ways to prescribe the medication, including methods for ensuring terminality and competency—medical diagnoses and determinations they are historically and routinely called upon to make outside the context of aid in dying. For instance, physicians frequently assess competency in order to obtain informed consent for surgical and other medical procedures. Doctors are typically capable of differentiating between clinical depression and a sincere, informed decision to seek aid in dying, and they are required by the standard of care to take a patient-centered approach to the issue,

ensuring that all options have been meaningfully discussed by first exploring a patient's needs and fears related to death from terminal illness. Physicians also have experience diagnosing terminality before changing a patient's model of care from curative to hospice and before terminally sedating any patient. Some amici assert that doctors "often get terminality wrong in determining eligibility for hospice care." But they offer no supporting evidence, and the statement ignores the fact that we entrust doctors to make these judgments every day in accordance with the relevant standards of care in the medical profession. That some people may defy the odds and that doctors may be wrong from time to time are not reasons to deny to all New Mexicans a constitutional right to aid in dying. No diagnosis is fool proof. But the law does not require 100% certainty. The United States Supreme Court in *Casey* drew a line based on estimated time of fetal viability. Estimates of end-of-life are functionally no different.

{134} In my view, the potential for abuse is far more likely in other circumstances not proscribed by law. For example, the State suggested at oral argument that patients could legally stockpile their medication and ingest it to end their lives. And, as discussed, doctors already help patients end their lives by withholding essential medical care and by practicing terminal sedation, neither of which are subject to

statutory regulation or to any reporting or recording requirements. Further, experts presented uncontested testimony that patients are sometimes sedated to death according to the instructions of physicians or surrogate decision makers, without the patient's explicit consent and without anyone "knowing what the patient would exactly want because the illness itself or the treatment has rendered them past [the] point of competency." It is hard to imagine that aid in dying makes the potential for abuse any more likely than do these practices; indeed, these practices could well create a greater risk of abuse. As noted constitutional scholar Erwin Chemerinsky put it, bluntly:

> Indeed, the same concern [about abuse] can be raised about the right to refuse medical care. A person could choose to terminate treatment because of pressure from family members or to reduce their emotional or financial burdens. Notwithstanding this concern, the [United States Supreme] Court recognized a right to refuse medical care in *Cruzan*. There is no reason why the concern is weightier or more powerful in the context of [aid in dying].

> Besides, if the concern is pressure, the solution should be to lessen the risk of pressure, not to prohibit [aid in] dying. And if the government is concerned that individuals might feel pressure to save their families from large expenses, then the government should ensure that the costs of medical care are adequately covered.

Chemerinsky, *supra*, at 1512.

{135} The unsupported assertions of the State and its amici about potential abuses are questionable, at best. The speculative possibility that vulnerable individuals might be induced or coerced to hasten their deaths cannot justify denying to all New Mexicans the constitutional right to aid in dying.

{136} Finally, amici raise a host of slippery slope arguments, including that aid in dying will assuredly lead to such horrors as euthanasia (voluntary and non-voluntary) of adults and children, that it will be administered by non-physician third parties, and that courts will soon be asked to extend the constitutional right to aid in dying to any competent person, regardless of whether or not the person is terminally ill. These cataclysmic predictions provide no basis to deny a constitutionally protected right to aid in dying. As the United States Supreme Court observed in *Cruzan*, "it is the better part of wisdom not to attempt, by any general statement, to cover every possible phase of the subject." 497 U.S. at 278 (alteration, internal quotation marks, and citation omitted); *see also Marozsan v. United States*, 852 F.2d 1469, 1498 (7th Cir.1988) (Easterbrook, J., dissenting) (stating that "[t]he terror of extreme hypotheticals produces much bad law"). The State has had "ample opportunity to articulate a constitutionally adequate justification" for prohibiting aid in dying. *Griego*, 2014-NMSC-003, ¶ 68. It has not done so.

133

{137} It is possible that, in another case, presenting different facts, the State might assert interests that a court might view differently. In this case, I end where I began, asking what possible interest the State could have in denying to a mentally competent, terminally ill patient whose medical condition is irreversible and irremediable, who has but a short time to live, and who is experiencing intractable suffering, the right to die peacefully, with dignity, at a time of her own choosing. The State has not advanced a sufficiently persuasive justification for denying aid in dying as that term is defined herein. Indeed, the State has acknowledged the profoundly diminished value of its asserted interests, to the extent it has not conceded that the interests do not exist at all. The factual record in this case, to which the State stipulated in its entirety—including the expert testimony, the comprehensive body of data that has been amassed since *Glucksberg*, and the current state of medical practice and the standard of care—taken together with the State's significant concessions, compel the conclusion that the State's asserted interests do not, and cannot, withstand scrutiny under any standard of review; strict, intermediate, or rational basis. I would hold that Section 30-2-4 is unconstitutional as applied to a willing physician's act of providing aid in dying at the request of a mentally competent, terminally ill patient who wishes a peaceful end of life as an alternative to being forced to endure an unbearable dying

process marked by suffering, including extreme pain and/or the loss of autonomy and dignity.

## IV.   THE REMAND PROPOSAL

{138}   The author of the majority opinion, having concluded that the right asserted by Plaintiffs is not a fundamental right, would remand for the district court to (1) determine whether the State has met its burden to justify Section 30-2-4's proscription against aid in dying under intermediate scrutiny; (2) determine whether Section 30-2-4 is constitutional under rational basis review; (3) decide the merits of other constitutional theories that Plaintiffs raised below but did not cross appeal; and (4) make any additional "factual findings relevant to issues left unaddressed by the district court." Majority Op. ¶¶ 48-53. This proposal is completely at odds with the majority opinion's suggestion that it would be inappropriate for this Court to recognize a fundamental right because our Supreme Court is "the ultimate arbiter of the meaning of" our Constitution. Majority Op. ¶ 38. It goes without saying that our Supreme Court will have the final word. But it does not follow that this Court must remain mute until it does. (The cases cited by the majority do not stand for that proposition.) Regardless, it is impossible to reconcile this reasoning with a proposal

135

to remand. And remand cannot be squared with true and settled legal principles as applied to this case.

{139} First, the question whether a constitutional right exists is a pure question of law, as is the standard to be applied in determining whether a governmental infringement of that right is constitutionally justified, *i.e.*, the level of scrutiny to be applied to the challenged statute. *State v. Lucero*, 2007-NMSC-041, ¶ 8, 142 N.M. 102, 163 P.3d 489 ("[The appellate courts] review issues of statutory and constitutional interpretation de novo."); *Breen v. Carlsbad Mun. Sch.*, 2005-NMSC-028, ¶ 15, 138 N.M. 331, 120 P.3d 413 ("The determination of which level of scrutiny is applicable under the Constitution is a purely legal question, and is reviewed de novo."); *Hyden v. N.M. Human Servs. Dep't*, 2000-NMCA-002, ¶ 12, 128 N.M. 423, 993 P.2d 740 (stating that interpretation of the state constitution is reviewed de novo). This means that we consider the legal question whether our Constitution protects the right asserted without any deference to the district court's conclusions on the issue. *In re Estate of Duran*, 2003-NMSC-008, ¶ 14, 133 N.M. 553, 66 P.3d 326 (explaining that the appellate court is not bound by district court's legal conclusions and "may independently draw [its] own conclusions of law on appeal" (internal quotation marks and citation omitted)); *Romero Excavation & Trucking, Inc. v. Bradley Constr., Inc.*,

1996-NMSC-010, ¶ 5, 121 N.M. 471, 913 P.2d 659 (stating that the appellate court does not defer to district court's legal conclusions but "determine[s] whether the [district] court correctly applied the law to the facts of the case"). And that means that a remand would be utterly pointless; all the more so here because the district court's conclusion that the asserted right is protected by our Constitution as a fundamental right necessarily includes the conclusion that the right is at least important, and the State has conceded that it cannot meet its burden under intermediate scrutiny to demonstrate a substantial governmental interest sufficient to justify Section 30-2-4's intrusion on the right. As Justice Bosson stated in emphasizing that appellate courts should consider state constitutional issues, even if the district court did not, if the party asserting the right cited a state constitutional provision below:

> [E]ven if the court is not alerted, of what real import is that to the resolution of a pure question of law? The factual record here is not subject to any material dispute. This Court can decide the . . . issue whether or not the trial court addressed it. While in a perfect world the trial court should address each issue first, that aspiration should not be determinative. The statewide interest in development of our state Constitution tips the balance in favor of proceeding, and we should not hesitate to do so.

*Garcia*, 2009-NMSC-046, ¶ 63 (Bosson, J., concurring). Although Justice Bosson's comments were made in the context of discussing the requirements for preserving a

state constitutional issue for appeal (an issue not presented here, where Plaintiffs' claims are based solely on the New Mexico Constitution), the point pertains.

**{140}** To the extent the author of the majority opinion believes that the district court should make further "findings," the factual record is undisputed, and our review is de novo on this aspect of the case as well. *See City of Albuquerque v. One 1984 White Chevy Ut.*, 2002-NMSC-014, ¶ 5, 132 N.M. 187, 46 P.3d 94 (explaining that the appellate courts review issues under de novo standard when there are no disputed material facts); *State v. Esparza*, 2003-NMCA-075, ¶ 13, 133 N.M. 772, 70 P.3d 762 ("Because the underlying facts . . . are not in dispute, we review the legal issues presented de novo."). The majority opinion's concern with factual findings in a case in which the facts are entirely undisputed is baffling in itself. But even assuming a legitimate concern, the author of the majority opinion does not identify a single fact purportedly necessary to resolve the legal issues presented in this case that is not already contained in the stipulated record; the opinion, in fact, does not address the factual record at all. Nor does the State argue that the record is incomplete, or that it lacked the opportunity to present its case in the district court. To the contrary, the State's counsel said below that "the issues are not fact disputes but legal disputes"

and that he thought he "would be willing to stipulate to any facts that Plaintiffs wanted to prove."

{141} The contention that remand is necessary so that the district court can rule on other constitutional theories raised by Plaintiffs that the court saw no need to reach in light of its ruling is contrary to elementary legal principles. Appellate courts routinely affirm district court rulings on purely legal issues where the record allows, even when the district court relied on different reasoning, and when the court did not consider the issue at all. *State v. Vargas*, 2008-NMSC-019, ¶ 8, 143 N.M. 692, 181 P.3d 684 ("[W]e may affirm the district court's order on grounds not relied upon by the district court if those grounds do not require us to look beyond the factual allegations that were raised and considered below." (internal quotation marks and citation omitted)); *State v. Snyder*, 1998-NMCA-166, ¶ 8, 126 N.M. 168, 967 P.2d 843 (considering a state constitutional issue that was not considered or ruled upon in the district court); *State v. Beachum*, 1972-NMCA-023, ¶ 8, 83 N.M. 526, 494 P.2d 188 ("A decision of the trial court will be upheld if it is right for any reason."). No one argues that the district court erred by failing to determine whether the right to aid in dying is "important" even if it is not "fundamental," as the district court held it was. Nor does anyone claim that the district court erred by failing to rule on

139

Plaintiffs' other constitutional theories. Appellate courts treat claims made in the district court but not pressed on appeal as abandoned. *English v. English*, 1994-NMCA-090, ¶ 14, 118 N.M. 170, 879 P.2d 802. And the law requires that courts avoid reaching constitutional questions that need not be decided. *Minero v. Dominguez*, 1985-NMCA-100, ¶ 5, 103 N.M. 551, 710 P.2d 745 ("As a general principle, courts do not reach constitutional questions unless absolutely required to do so in order to resolve an issue presented."). The notion that a remand is necessary to decide abandoned constitutional issues so that "potential piecemeal appeals" may be avoided, *see* Majority Op. ¶ 52, makes no sense.

{142} The law does not require "the doing of useless things." *State ex rel. Peters v. McIntosh*, 1969-NMSC-103, ¶ 9, 80 N.M. 496, 458 P.2d 222. The facts and principles necessary to a correct holding are known. A remand would be pointless and would needlessly consume the resources of the parties and the courts while delaying final disposition by our Supreme Court.

**V.    SEPARATION OF POWERS**

{143} The State contends that New Mexico courts may not consider whether the Legislature's criminalization of aid in dying is unconstitutional because doing so

violates "separation of powers."[24] First, it argues that decisions about aid in dying are best left to the Legislature because that branch of government is directly accountable to the people, and the fact that Section 30-2-4 has been on the books for forty-two years without amendment demonstrates that the law reflects the values and social mores of New Mexico citizens. Second, the State argues that the "legal landscape surrounding physician[-]assisted suicide is unclear and filled with the kind of uncertainty the resolution of which demands legislative action." I address the State's arguments in reverse order.

{144} The State's argument based on the lack of existing regulations specifically governing the conduct of physicians who provide aid in dying has no merit. As a threshold matter, this argument has nothing to do with the separation of powers; rather, it concerns the type and scope of procedural safeguards the State says are necessary to govern the practice of aid in dying. The State's argument, moreover, is

---

[24]The separation of powers clause states:

> The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others, except [where constitutionally excepted].

N.M. Const. art. III, § 1.

internally inconsistent, relying on contradictory contentions. The State first contends that the district court erred by failing to implement procedural safeguards for aid in dying such as those set forth in Oregon's Death With Dignity Act. It then argues that the court "lacks the constitutional power to put these safeguards in place" because these are exclusively legislative determinations. The State is correct that it is not the role of the court to legislate. But a ruling that the New Mexico Constitution protects the right to aid in dying in no way usurps the Legislature's power to regulate aid in dying in a manner that comports with that ruling. To the extent the Legislature deems regulations appropriate or necessary, nothing would prevent it from enacting constitutionally permissible measures.

{145} The State's argument that the district court impermissibly intruded upon the exclusive province of the Legislature evinces a fundamental misunderstanding of the role of judicial review. Indeed, a decision holding Section 30-2-4 unconstitutional as applied to aid in dying necessarily would vitiate the State's argument that the district court violated the provisions in our Constitution requiring separation of powers. *See NARAL*, 1999-NMSC-005, ¶ 59 ("It is a function of the judiciary when its jurisdiction is properly invoked to measure the acts of the executive and the legislative branch solely by the yardstick of the [C]onstitution." (internal quotation marks and citation

omitted)); *see also Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."); *Dillon v. King*, 1974-NMSC-096, ¶¶ 27-28, 87 N.M. 79, 529 P.2d 745 (holding that the Constitution is the supreme law of the land and that it is the judiciary's "function and duty to say what the law is and what the Constitution means"). When a constitutionally protected interest is at stake, preference for the legislative process cannot constrain this Court, no matter how long the law at issue has been in effect. *See Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 678 (1970) ("[N]o one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it."); *Loving*, 388 U.S. at 6-8 (noting that the state cannot rely on a history of exclusion to narrow the scope of the right); *Brown*, 347 U.S. at 492-93 (same); Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 Harv. L. Rev. 457, 469 (1897) ("It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past."). The State urges us to abdicate our constitutional responsibility to decide this matter. This I cannot and will not do.

{146} Just over a year ago, our Supreme Court struck down a statutory scheme dating back almost a century that effectively precluded same-sex couples from marrying. At the time, many argued that the policy debate over same-sex marriage, like the current debate over aid in dying, was best left to the legislative process and that judicial review would violate the separation of powers. Our Supreme Court did not retreat from its constitutional responsibility in favor of leaving the matter to civic discourse and legislative action. In *Griego*, 2014-NMSC-003, ¶ 1, Justice Chávez began by underscoring the duty of courts to interpret and apply the protections of the Constitution when the government is alleged to have threatened individual rights. The Court rejected at the outset the premise of the argument the State makes here:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

*Id.* (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943)). The Court went on to recognize for the first time a right to same-sex marriage and held that our marriage laws were unconstitutional insofar as they applied only to opposite-sex couples. *Id.* ¶ 69; *see also Obergefell*, ___ U.S. at ___, 135 S. Ct. at 2605 ("The

144

dynamic of our constitutional system is that individuals need not await legislative action before asserting a fundamental right. The Nation's courts are open to injured individuals who come to them to vindicate their own direct, personal stake in our basic charter. An individual can invoke a right to constitutional protection when he or she is harmed, even if the broader public disagrees and even if the legislature refuses to act."); *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) ("It is plain that the electorate as a whole, whether by referendum or otherwise, could not order city action violative of the Equal Protection Clause[.]"); *Chambers v. State of Florida*, 309 U.S. 227, 241 (1940) ("Under our constitutional system, courts stand against any winds that blow as havens of refuge for those who might otherwise suffer because they are helpless, weak, outnumbered, or because they are non-conforming victims of prejudice and public excitement.").

{147} While I recognize that Section 30-2-4 was enacted over four decades ago, I disagree with the contention of the State and the concurring opinion, *see* Concurring Op. ¶ 62, that this fact immunizes the statute from judicial review of its constitutionality. The argument is little more than a bald assertion that the Legislature may constitutionally criminalize conduct simply because 'twas ever thus. The law is to the contrary. A ruling that Section 30-2-4 is unconstitutional as applied to aid in

dying reflects neither ignorance nor disregard of a quintessential legislative function. It would not violate the separation of powers. It would simply be an exercise of judicial authority and responsibility that is a founding principle of our system of government. This is what courts do.

* * * *

{148} The question at the heart of this case is who has the right to decide when and how a mentally competent, terminally ill New Mexican will end her life after the options for meaningful improvement of her terminal condition have been exhausted, such that "life" means being forced to endure unbearable suffering until death arrives.[25] I recognize that citizens may disagree about the profound implications of a terminally ill individual's decision to end her suffering by ending her life, but our judicial obligation is to give effect to the liberty interests of all New Mexicans in accordance with the guarantees of our Constitution. Other choices and decisions central to personal autonomy and dignity have long enjoyed the status of constitutionally protected liberty interests. I would hold that the New Mexico

---

[25] "There are times when even the most accommodating sufferers can endure no more pain, no further losses of function, and no additional insults to their bodily and personal integrity. Despite receiving good palliative care, and regardless of prognosis, these patients arrive at a point where they are ready to end the struggle with their illness." Stern & Difonzo, *supra*, at 400 (footnote and internal quotation marks omitted).

146

Constitution protects aid in dying as a liberty interest subject to heightened scrutiny. While it is impossible for me to conclude that governmental infringement of the right to aid in dying could be justified by any lesser interest than that required for constitutional rights previously recognized as "fundamental," the required level of scrutiny need not be determined in this case. For the State concedes that mentally competent, terminally ill citizens have a fundamental right to decide for themselves when and how to end their lives, and it provides no acceptable justification for denying them the only means available to effectuate that right in a peaceful and dignified manner—a lethal dosage of medication prescribed by a willing physician acting in accordance with the established standard of care for aid in dying. It is beyond dispute that the suffering of these citizens "is too intimate and personal for the State to insist, without more, upon its own vision . . . , however dominant that vision has been in the course of our history and our culture." *Casey*, 505 U.S. at 852.

_____

**LINDA M. VANZI, Judge**

147